**William FOXWORTH, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Director, Division of Corrections, Respondent-Appellee.**

No. 74–3235.

United States Court of Appeals, Fifth Circuit.

Aug. 1, 1975.

Thomas C. MacDonald, Jr., Tampa, Fla., for petitioner-appellant.

Robert L. Shevin, Atty. Gen., Raymond L. Marky, Carolyn Snurkowski, Asst. Attys. Gen., Tallahassee, Fla., for respondent-appellee.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

The sole issue presented for review in this habeas corpus case is whether petitioner was denied effective assistance of counsel, appointed to represent him and two codefendants on a murder charge, because such representation allegedly resulted in a conflict of interest. The district court concluded that petitioner was not denied effective assistance of counsel and dismissed the petition. We reverse.

I. Factual Background

On the morning of September 1, 1944, Earl Wilson, a teenage prisoner at the Florida Industrial School at Marianna, Florida, was found dead in a "confinement cottage" (a cell approximately 7 feet by 10 feet, resembling a concrete bunker), where petitioner Foxworth (then 14 years of age) and seven other teenage boys (ages 11 to 17) had been held for periods varying from a few days in the case of some of the boys to a few weeks in the case of Foxworth himself. The cell contained one set of bunk beds, an open bucket for toilet needs (emptied once daily), a bucket for drinking water, and a continuously burning light bulb.

Four of the boys in the cell, including Foxworth, were charged with murdering Earl Wilson, and the other four became prosecution witnesses. Because Florida had no juvenile statute at that time, the four faced a sentence of death in the electric chair if convicted. One attorney was appointed to represent Foxworth and two of the other boys, Charles Bevels and Robert Farmer. The fourth, Floyd Alexander, had privately retained counsel.

At the trial, which lasted one day, the prosecution's theory was that the four defendants had choked Earl Wilson by holding him down and pressing a stick against his throat.[1] This theory was presented in the versions of the facts related by the four boys who testified

1. According to the undisputed testimony at trial, the stick had been left outside the concrete cell by an attendant. It was dragged into the cell by tossing a blanket through the bars and then pulling it back.

for the prosecution. These witnesses also testified that earlier in the day one of the defendants, Charles Bevels, had struck Earl Wilson repeatedly with the stick. The medical evidence, given by a doctor summoned when Earl Wilson was found dead, was that death was caused by blows to the head with a blunt instrument. A dissection of the decedent's neck muscles revealed no bruises. The four defendants' theory, as presented in their testimony, was that the incident in which they held the stick to Earl Wilson's neck was just horseplay. They contended that the four prosecution witnesses killed decedent by beating him on the head with the stick.

The jury returned a verdict of guilty against all four defendants, but recommended mercy. The court imposed life sentences on all four defendants.[2] The conviction was affirmed by the Supreme Court of Florida. Bevels v. State, Fla., 1945, 156 Fla. 159, 23 So.2d 156.

Foxworth's first collateral attack on his trial was a motion in the Florida state circuit court, under the Florida Rules of Criminal Procedure, to vacate his conviction. The petition was summarily denied, and he filed a petition for a writ of habeas corpus in the Supreme Court of Florida, which also denied relief. Foxworth v. Wainwright, Fla., 1964, 167 So.2d 868. He later filed another motion to vacate and set aside the judgment of conviction and sentence, this time in the Florida circuit court where he was tried. This motion was denied, and Foxworth appealed to the Florida district court of appeals, which affirmed the circuit court. Foxworth v. State, Fla.App., 1970, 231 So.2d 229. A second petition for habeas corpus was then filed in the Florida Supreme Court, which, without a published opinion, again denied the writ.

Foxworth next filed a habeas petition in federal district court. The writ was denied. Foxworth v. Wainwright, N.D. Fla., 1970, 319 F.Supp. 593. The court apparently interpreted Foxworth's complaint, which was filed pro se, as alleging that the joint trial, rather than just the joint representation, was the source of error. The court concluded that

> The mere representation of co-defendants by single court-appointed counsel is not per se a constitutional violation of such dimension as would warrant habeas corpus relief and such practice has been widely accepted in this Circuit and recognized as necessary economy of legal resources. Generally, application for a severance is a matter the granting of which rests within the discretion of the trial court and it must be affirmatively shown that prejudice to petitioner resulted from the failure to grant a severance. Petitioner has provided no showing to this Court that he was prejudiced in being jointly tried with his other co-defendants and having read the transcript on file, this Court finds no prejudice.

319 F.Supp. at 596–597.

On appeal this Court held, in light of his attorney's abandonment of his appeal, that Foxworth was entitled to a review of his conviction in the state court with the aid of counsel. Foxworth v. Wainwright, 5 Cir., 1971, 449 F.2d 319. We expressly pretermitted "consideration of the additional contentions of Foxworth that he was denied effective assistance of counsel at trial because of a conflict of interest between Foxworth and his co-defendant Bevels . . .." 449 F.2d at 320.

The Supreme Court of Florida concluded that habeas corpus was the appropriate procedure for reviewing the conviction, and the Court eventually affirmed. Foxworth v. State, Fla., 1972, 267 So.2d 647, cert. denied, 411 U.S. 987, 93 S.Ct. 2276, 36 L.Ed.2d 965 (1973). In

---

**2.** Counsel for Foxworth informed the court at oral argument that, although petitioner has not been incarcerated continuously since his conviction, the Division of Corrections of the State of Florida has confirmed that he is presently in custody pursuant to this judgment of conviction and sentence. Thus it is undisputed that there is jurisdiction to entertain this habeas corpus action.

addressing Foxworth's allegation of conflict of interest, the Court concluded:

> In other words, court-appointed counsel, as well as Alexander's independent counsel, applied the basic principle, "United we stand, divided we fall." This was a matter of strategy, concurred in by independently-retained counsel, and it appears that Foxworth's attorney did, in fact, render reasonably effective assistance.

267 So.2d at 651.

Having thus finally exhausted his state remedies, Foxworth filed an amended petition for habeas corpus in the federal district court, again alleging denial of effective assistance of counsel due to conflict of interest. The district court summarily denied all relief, relying chiefly on the opinion of the Florida Supreme Court in its belated review of Foxworth's conviction, as ordered by this Court. Petitioner appeals from this adverse judgment. The posture of the case now before us permits consideration of the constitutional issue of the effective assistance of counsel. Accordingly, we turn to the merits of petitioner's contention that he was denied effective assistance of counsel due to a conflict of interest between himself and his codefendant, Charles Bevels.

## II. Conflicts of Interest and the Right to Effective Assistance of Counsel

■ The right to counsel guaranteed by the Sixth Amendment means the right to reasonably effective counsel. *See* Herring v. Estelle, 5 Cir., 1974, 491

F.2d 125; MacKenna v. Ellis, 5 Cir., 1960, 280 F.2d 592, *mod. on other grounds,* 289 F.2d 928. Long before this guarantee was held to be incorporated into the Fourteenth Amendment,[3] the Supreme Court held that

> the "Assistance of Counsel" guaranteed by the Sixth Amendment contemplates that such assistance be untrammelled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests.

Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). Joint representation by appointed counsel does not inherently deprive a defendant of the effective assistance of counsel. *See* United States ex rel. Hart v. Davenport, 3 Cir., 1973, 478 F.2d 203; United States v. Lovano, 2 Cir., 1970, 420 F.2d 769. Nevertheless, courts must avoid compromising counsel's ability to "represent a client zealously within the bounds of the law" by appointing one lawyer to defend two or more parties with inconsistent interests.[4] ABA Canons of Professional Ethics, Canon 7. A conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing.

■ The trial judge has an obligation, however, to anticipate conflicts reasonably foreseeable at the outset of the case, when counsel is appointed.[5] *See*

---

**3.** Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Gideon* has been held fully retroactive. *See, e. g.,* Loper v. Beto, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972); Webster v. Estelle, 5 Cir., 1974, 505 F.2d 926, 928.

**4.** In this case we address solely the question whether it was error to appoint one attorney for three defendants, and to fail to terminate the joint representation when an actual conflict became apparent. Joint representation by retained counsel is a different question entirely. *See* Fitzgerald v. Estelle, 5 Cir., 1975, 505 F.2d 1334.

**5.** The trial court is not required, however, to warn codefendants of the disadvantages, in-

cluding possible conflicts of interest, of joint representation. United States v. Boudreaux, 5 Cir., 1974, 502 F.2d 557. There is some suggestion in our prior decisions that the trial court must be held responsible for failing to foresee conflicts of interest even when they are not reasonably apparent, on the ground that a conviction resulting from an unfair trial cannot be upheld, irrespective of blame. Porter v. United States, 5 Cir., 1962, 298 F.2d 461, 464. Because we believe the conflict was reasonably apparent in this case we need not consider whether *Porter* is still viable. *See* Fitzgerald v. Estelle, *supra.*

United States v. Williams, 5 Cir., 1970, 429 F.2d 158, 161; Austin v. Erickson, 8 Cir., 1972, 477 F.2d 620, 623; United States v. Alberti, 2 Cir., 1972, 470 F.2d 878, 881; United States v. Lovano, *supra*, 420 F.2d at 772. In this case four boys were accused of participating simultaneously in the murder of a fifth boy in a small cell at a state reformatory. There were no witnesses except the other occupants of the cell, who were also young boys. Under these circumstances, the trial court should have foreseen the substantial possibility that one of the boys might be in a position to further his own defense by showing that a codefendant, especially an older one, was solely responsible for the crime.[6] Joint representation of three of the four codefendants by one appointed attorney was prejudicial and denied Foxworth the effective assistance of counsel.[7]

In this case an actual, substantial conflict emerged early in the trial. The first witness was a physician, who testified that Earl Wilson's death was caused by blows to the top of the head with a blunt instrument. The second witness for the prosecution was Curtis Wilson, one of the other boys in the cell when the murder occurred. Although his answers were not too clear, the thrust of his testimony was that Charles Bevels had beaten decedent badly on the head with a stick shortly before their supper was brought to the cell. After supper, he testified, Bevels pressed the stick to decedent's neck while the other three defendants held him down, thus choking him. Thus if the medical testimony was correct and the prosecution's first eyewitness was to be believed, Bevels alone participated in the death-dealing blows.[8] Foxworth was implicated only in a part

---

**6.** Charles Bevels, Foxworth's 17-year-old codefendant, was the oldest boy in the cell.

**7.** The term "prejudice" has appeared occasionally in this Court's decisions on conflict of interest. For example, in Gardner v. Wainwright, 5 Cir., 1970, 433 F.2d 137, 139, we denied habeas corpus relief because there was "nothing in the record or elsewhere that would lead us to conclude that the joint representation by court-appointed counsel was prejudicial to appellant." *See* United States v. Pinc, 5 Cir., 1971, 452 F.2d 507; United States ex rel. Hart v. Davenport, 3 Cir., 1973, 478 F.2d 203 (prejudice and conflict of interest used synonymously); United States v. Lovano, 2 Cir., 1970, 420 F.2d 769 (*id.*); Farris v. Hunter, 10 Cir., 1944, 144 F.2d 63. These cases make it clear that a conflict of interest does not violate the right to effective assistance of counsel if it is irrelevant or merely hypothetical. *See* Burston v. Caldwell, 5 Cir., 1975, 506 F.2d 24; United States v. Williams, 5 Cir., 1970, 429 F.2d 158; United States v. Alberti, 2 Cir., 1972, 470 F.2d 878; United States v. Lovano, *supra*; Kruchten v. Eyman, 9 Cir., 1969, 406 F.2d 304, *vac. on other grounds,* 408 U.S. 934, 92 S.Ct. 2853, 33 L.Ed.2d 748; Fryar v. United States, 10 Cir., 1968, 404 F.2d 1071; Curry v. Burke, 7 Cir., 1968, 404 F.2d 65.

If an actual, significant conflict is found, however, the degree of prejudice is not to be considered:

> We were foreclosed from any inquiry as to whether the prejudice to [defendant] was sufficient to cause him to lose his case by *Glasser* when the Supreme Court said:

> . . . The right to have assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.

Baker v. Wainwright, 5 Cir., 1970, 422 F.2d 145, 149. Thus prejudice, as used in connection with the harmless error rule, need not be shown. *See* Castillo v. Estelle, 5 Cir., 1974, 504 F.2d 1243, 1245; White v. United States, 5 Cir., 1968, 396 F.2d 822, 824; Austin v. Erickson, *supra*, 477 F.2d at 624; Goodson v. Peyton, 4 Cir., 1965, 351 F.2d 905, 909; Case v. State of North Carolina, 4 Cir., 1963, 315 F.2d 743, 745; Larry Buffalo Chief v. State of South Dakota, 8 Cir., 1970, 425 F.2d 271, 280; Fryar v. United States, *supra*, 404 F.2d at 1073; Kruchten v. Eyman, *supra*, 406 F.2d at 311. This approach is consistent with the rule that, unlike many trial errors, denial of the right to assistance of counsel calls for automatic reversal of a conviction. Chapman v. California, 386 F.2d 18, 23 n. 8, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967).

**8.** *See, e. g.,* Appendix pp. 16, 32, 65. There was also an occasional mention in the testimony of the prosecution witnesses of blows being struck by Farmer. Appendix pp. 28, 42. If this testimony and the testimony concerning Bevels' and Farmer's motive for murder is credited, Foxworth's position appears even more compromised. *See* testimony cited in footnotes 11–13 *infra*. To present on Foxworth's behalf the alternative defense we have described, appointed counsel would have had to imperil not just one of his other clients but both of them.

of the sequence of events that, according to the doctor, was not the cause of death.[9]

To one degree or another, the testimony of the other boys called by the prosecution (Alfred Washington, Henry Gordon and Nesbitt McCall) corroborated Curtis Wilson's version of the facts.[10] As each of these witnesses testified, the attorney representing Foxworth, Bevels and Farmer was prevented from exploiting the divergence between the medical testimony and witnesses' accounts of Foxworth's involvement. If he had tried to establish that, as much of the testimony suggested, Foxworth was not involved in the apparently fatal beatings, but rather Bevels was the sole perpetrator, he may have sent Bevels, who was as much his client as Foxworth, to the electric chair.[11]

There was other evidence in the record which Foxworth's counsel could have used to exculpate him if counsel had not also been representing Bevels and Farmer. Curtis Wilson and Henry Gordon testified that Bevels and Farmer had discussed the killing of Earl Wilson in advance.[12] Alfred Washington testified that Foxworth and Alexander were "just playing." Motives were established for Bevels and Farmer, but not for Foxworth and Alexander. Alfred Washington testified that Foxworth and Alexander were not mad at Earl Wilson. Bevels and Farmer, on the other hand, were mad at decedent because, according

---

9. A number of times during the trial, several of the boys who testified for the prosecution stated, in various context, that "they" beat Earl Wilson with the stick. Appendix pp. 38, 55, 56, 58, 60, 61. Who among the defendants is included in "they" is never explained or explored on cross-examination. The only reference to Foxworth striking blows is a highly dubious one by Curtis Wilson:

> Q. You didn't see William Foxworth hit [decedent].
> A. Yes, sir.
> Q. When did William hit him?
> A. He had done lay down. Water on the floor and the boy kicked him.
> Q. Who kicked Earl Wilson?
> A. Robert Farmer.

Appendix p. 29. The questioning proceeds concerning the kicking by Farmer, and the testimony occurs in the context of an incident in which Earl Wilson, according to the witness, spilled some "slop" out of the waste bucket onto Robert Farmer, who became provoked. Even if the testimony is taken to mean that Foxworth did hit Earl Wilson at some point, there is no indication that he struck him with the stick that apparently was the murder weapon, or at least was the only blunt instrument in the cell.

Moreover, Alfred Washington testified that no one was holding decedent when Bevels struck him with the stick. Appendix p. 38. Curtis Wilson testified that no blows were struck when defendants allegedly were holding decedent down, Appendix p. 16, and that only Bevels struck decedent with the stick. Appendix p. 32.

10. See Appendix pp. 38, 40, 42, 43 (testimony of Alfred Washington); pp. 48, 53 (testimony of Henry Gordon); pp. 61, 65 (testimony of Nesbitt McCall).

11. Counsel's dilemma was apparent on cross-examination. At times he could do little more than try to bring out confusion and internal inconsistency in the testimony of the prosecution witnesses. Occasionally the only way to do this was by suggesting to the witness that the roles of the defendants were the reverse of what the witness had described them to be. For example, in cross-examining Curtis Wilson, counsel attempted to shake his statement that Bevels was the one who had pressed the stick to decedent's neck:

> Q. Now, don't you know that the stick was put on this boy's neck by that first boy, William Foxworth. That Foxworth had the stick.
> A. Charles Bevels.
> Q. Didn't William Foxworth do that?
> A. No, sir.
> Q. Have him down holding the stick with one hand and the other side with his knee?
> A. No, sir.

Appendix p. 24; see Appendix pp. 52, 66. In cross-examining Alfred Washington, counsel attempted to shake his version of the part each defendant played in holding down decedent during the alleged choking incident:

> Q. Did you see any cotton there?
> A. Yes, sir, Robert Farmer took some cotton from under the bed and put it in [decedent's] mouth.
> Q. Don't you know it was Charles Bevels that did that?
> A. No, sir. Robert Farmer.

Appendix p. 43.

We quote these passages not to demonstrate counsel's indifference to Foxworth's or Bevels' interests, but rather to illustrate the effects of the dilemma caused by the joint representation. Under the circumstances counsel did as well as could be expected.

12. See Appendix pp. 10, 37, 39, 40, 47, 51.

to Alfred Washington's testimony, they had hidden some spoon handles in the cell to use in digging their way out, and Earl Wilson was going to tell the reformatory officials of their plan.[13]

It is unclear, to say the least, that such a defense would have been successful for Foxworth. The doctor's testimony did not give the impression that his examination had been exhaustive, and if recalled to the stand, he could have clarified his determination as to the cause of death. The testimony of the prosecution witnesses was vague in many places and occasionally contradictory concerning the details of events on the day of the murder.[14] If Foxworth's attorney had not been obliged to try to save Bevels and Farmer and had attempted to clarify these details through cross-examination, it is possible that the basis for the defense we have discussed would have evaporated. Upon closer questioning the witnesses might have recalled some participation by Foxworth in the beating or motive on his part for the killing. We do not believe, however, that petitioner must show that his attorney's divided loyalties cost him a directed verdict. Rather, if the record shows that a plausible defense (one that might have influenced twelve reasonable jurors) was foreclosed because it might have prejudiced the other defendants represented by the same appointed counsel, the conviction must be overturned. *See* Austin v. Erickson, *supra*, 477 F.2d at 624; Case v. State of North Carolina, 4 Cir., 1963, 315 F.2d 743, 745. The record in this

case amply establishes such a plausible defense. Under these circumstances, and considering as well the sheer burden of representing three clients on trial for a capital crime,[15] the joint representation deprived Foxworth of the right to effective assistance of counsel.

The State of Florida readily concedes that a defense of the sort we have described could have been presented on Foxworth's behalf, and that "if it had been tendered, [the appointed counsel] could not have defended both Bevels and Foxworth." The better strategy, however, according to the State (relying on the reasoning of the Florida Supreme Court in its belated review of Foxworth's conviction), was to adopt the "united we stand, divided we fall" approach taken by appointed counsel at trial. This approach had the additional virtue, the State argues, of avoiding any conflict of interest among the three defendants.

The State's analysis fails to appreciate that the conflict occurred not in presenting the defense chosen by appointed counsel, but in selecting defenses and strategies in the first place.[16] We are at a loss to see how a defense inculpating Bevels could have been tendered except by the active efforts of the appointed counsel; yet, as the State admits, such efforts would have grievously prejudiced Bevels' defense. Under these circumstances, counsel's choice of the "united we stand, divided we fall" defense was not a free choice of strategy. It was the only course open to an attor-

---

13. *See* Appendix pp. 42, 44.

14. For example, Curtis Wilson and Nesbitt McCall first testified that Bevels beat decedent after supper, but then said that the beating occurred before supper. *See* Appendix pp. 9, 19, 56, 58. Wilson finally said Bevels struck decedent both before and after supper. Appendix p. 21. Henry Gordon testified that Bevels beat decedent before supper, Appendix p. 53, but Alfred Washington testified that the beating by Bevels took place after supper. Appendix p. 40.

15. *See* Glasser v. United States, *supra*, 315 U.S. at 75, 62 S.Ct. at 467.

16. In Burston v. Caldwell, *supra*, we found that a defendant's case was not prejudiced by

the testimony of his codefendant, who was represented by the same counsel and therefore could not be cross-examined rigorously. The defendant, we concluded, would have called his codefendant as his own witness even if separate counsel had been appointed for each, because the codefendant's testimony, although implicating defendant in a misdemeanor (assault), absolved him of guilt on a capital felony charge (armed robbery). *Burston* makes clear that we must look not only at alleged conflicts in the defense which counsel presented for his clients, but also at alleged conflicts resulting from the availability of a plausible defense or strategy that separately appointed counsel would have had an opportunity to exploit. *See* Curry v. Burke, *supra*.

ney with the unenviable task of saving three boys from the electric chair.[17] "It must be remembered that in cases involving conflicts of interest, the conflict does not always appear fullblown upon the record, since counsel may throughout endeavor to reconcile the conflict." Austin v. Erickson, *supra*, 477 F.2d at 626.

An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible. *See* United States ex rel. Small v. Rundle, 3 Cir., 1971, 442 F.2d 235. The State argues that the defense of "united we stand, divided we fall" was a superior strategy to the one made impossible by the joint representation. In the first place, beyond determining whether the foreclosed defense was plausible, we are reluctant to speculate on what defenses counsel might have chosen to present for Foxworth if he had not been responsible for defending Bevels as well. More importantly, however, the defense inculpating Bevels would not have been inconsistent with the defense of "united we stand, divided we fall." Representing Foxworth alone, counsel could have cross-examined the prosecution witnesses more fully on their testimony inculpating Bevels, which, as we have pointed out, was not an avenue open to counsel because of the joint representation. He then could have urged the jury to accept the defendants' testimony as more credible than that of the four boys testifying for the prosecution, but in any event to acquit Foxworth because, accepting the testimony of the prosecution witnesses as true, Foxworth was not involved in the events that, according to the medical testimony, caused Earl Wilson's death. We conclude therefore that "[t]his is not simply a case where appellant criticizes the defense 'adopted' from hindsight." Austin v. Erickson, *supra*, 477 F.2d at 625.

Because the defense we have discussed was not inconsistent with the one actually presented at trial, it would have been plausible even though presented by Foxworth alone. That defense would have been based not on Foxworth's own credibility but rather on the assumption that the prosecution's witnesses were to be believed. Moreover, it is not clear that Foxworth would have been alone in adopting this strategy. The State concludes, as did the Supreme Court of Florida, that the privately retained counsel representing Alexander, one of Foxworth's codefendants, joined in the "united we stand, divided we fall" strategy. We have no record of the closing arguments, however, and it appears that Alexander's counsel did try to dissociate his client from the other defendants at several junctures during cross-examination.[18]

We fully appreciate the gravity of nullifying a conviction of this vintage.[19] *See* Webster v. Estelle, 5 Cir., 1974, 505 F.2d 926, 930–931 n. 4; Tyler v. Beto, 5 Cir., 1968, 391 F.2d 993, 994. In this case, however, the applicable principles of law are clear and well established, and the evidence of error is substantial. The cause is remanded with directions to grant the writ of habeas corpus and to discharge petitioner, unless the State elects to retry him within a reasonable time.

Reversed and remanded.

---

**17.** There is no indication of whether, at the time of his appointment, counsel made any objection to representing three of the defendants jointly. The record reveals no motion to withdraw at trial. In any event absence of an objection on the part of counsel would not necessarily show that no conflict of interest existed. For the same reasons, and also because Foxworth was a minor at the time of trial, the absence of an objection or motion to withdraw did not constitute a waiver of his right to effective assistance of counsel. *Cf.* United States v. James, 5 Cir., 1975, 505 F.2d 898 (where counsel representing an alleged prostitute had also represented a person al-

leged to have acted as her procurer, and defendant was fully aware of this prior representation, conviction would not be reversed except upon a showing of specific prejudice); Baker v. Wainwright, *supra*, 422 F.2d at 150.

**18.** *See, e. g.,* Appendix p. 39.

**19.** In this regard, however, it should be noted that petitioner was a boy of 14 at the time of his conviction, and thus unlikely to possess great acumen as a writ-writer. Moreover, the constitutional right to effective assistance of counsel was not applied to the states until 1963. Gideon v. Wainwright, *supra.*