Marol Donna MAXON, Petitioner,

v.

W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent.

Civ. A. No. 74–H–903.

United States District Court,
S. D. Texas,
Houston Division.

June 21, 1976.

Richard Prinz, Houston, Tex., for petitioner.

John L. Hill, Atty. Gen., of Tex., Calvin Botley, Asst. Atty. Gen. of Tex., Houston, Tex., for respondent.

MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

## I. INTRODUCTION

Petitioner's Application for Writ of Habeas Corpus is granted, and the writ is hereby issued. Petitioner was convicted by a jury after entering a plea of not guilty to the crime of possession of heroin. The jury sentenced her to ten (10) years in prison, *State of Texas v. Marol Donna Maxon,* Cause No. 184,331 (174th Judicial District Court, Harris County, Texas, March 6, 1973), and the Texas Court of Criminal Appeals affirmed the conviction. *Maxon v. State of Texas,* Cause No. 48,212, 507 S.W.2d 234 (Tex.Cr.App.1974). Petitioner's post conviction application for writ of habeas corpus in the state court was denied after the trial judge conducted an evidentiary hearing, *Maxon v. State of Texas,* Cause No. 48,212 H (174th Judicial District Court, Harris County, Texas, June 13, 1974), and this denial was affirmed without written order by the Texas Court of Criminal Appeals on June 26, 1974.

Petitioner contends in her application that she was denied effective assistance of counsel when her retained attorney represented both her and her common-law husband against the same criminal charges. Allegedly, an inherent conflict-of-interest existed between the strategic positions of the two co-defendants throughout trial so that petitioner's constitutional rights were violated. Petitioner has exhausted all available state remedies, and jurisdiction is proper in this Court pursuant to 28 U.S.C. § 2254.

Upon evaluating the facts of this case against the backdrop of applicable law,[1] the Court concludes that the proceeding at which petitioner was convicted and sentenced was fundamentally unfair so as to violate due process and that, in view of the state action in this case, petitioner was de-

---

1. *United States ex rel. Reis v. Wainwright,* 525 F.2d 1269 (5th Cir. 1976); *Gravitt v. United States,* 523 F.2d 1211 (5th Cir. 1975); *Alvarez v. Wainwright,* 522 F.2d 100 (5th Cir. 1975); *Foxworth v. Wainwright,* 516 F.2d 1072 (5th Cir. 1975); *Fitzgerald v. Estelle,* 505 F.2d 1334 (5th Cir.) (en banc), *cert. denied,* 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675 (1975); *Castillo v. Estelle,* 504 F.2d 1243 (5th Cir. 1974); *Herring v. Estelle,* 491 F.2d 125 (5th Cir. 1974); *Porter*

nied the effective assistance of counsel in violation of the Sixth Amendment as incorporated by the Fourteenth Amendment. Her conviction and sentence therefore cannot stand.

## II. FACTS

### A. Arrest

Petitioner and her common-law husband, Herbert "Buddy" Gill ("Gill"), resided together in an apartment in Houston, Texas. On August 29, 1972, police officers received information and obtained a search warrant to search the couple's apartment for drugs allegedly being concealed by petitioner and her husband. The facts are not in dispute as to what occurred when officers entered the apartment upon executing the warrant. Petitioner was observed standing by a bar which separated the kitchen and dining areas. Her hand was on a plastic shopping bag. The shopping bag was found to contain four small packets of heroin and various narcotics paraphernalia. Gill was not present at the time police officers entered the apartment. He arrived some two hours later and was taken into custody by officers at that time. The information originally conveyed to police officers was that Gill had been involved in narcotics dealings.

### B. Trial—"Guilt" Phase

#### 1. Motion to Suppress Evidence

Petitioner and Gill retained the services of Ed Shaw, Esq. ("Counsel"), an attorney of Houston, Texas, to represent them together at their trial. In developing his preparation for the case, Counsel did not consider or apprise his clients of the possibility of a conflict of interest in their respective positions.

When the trial began, the trial court first heard evidence out of the presence of the jury on defendants' motion to suppress evidence. One of the arresting officers and the supervisor of customer service of Houston Lighting and Power Co. were called by Counsel in an effort to challenge the accuracy of the description and address of the premises set forth in the search warrant affidavit. This motion was denied by the trial court, and presentation of the case-in-chief commenced before the jury.

#### 2. The State's Case

The prosecution called five witnesses: the three arresting officers, a chemist and the owner of the townhouses wherein petitioner and her husband resided. Counsel did not cross-examine the first officer; he cross-examined the second officer as to whether Gill was present at the time of the first entry of the officers, R. 162–64, and to emphasize Gill's absence at the time of the petitioner's arrest, R. 162; he asked the third officer only one question pertaining to the chain of custody of the confiscated narcotics; he did not cross-examine the chemist; and he cross-examined the landlord, R. 195–96, to demonstrate that the landlord did not personally know Gill and had never seen him before the day of the trial, thus attempting to raise the issue of whether Gill resided at the apartment. Objections made by Counsel during the State's presentation of evidence also emphasized Gill's exculpation and his separate posture in the case from petitioner. *E. g.,* R. 169.

#### 3. Counsel's Presentation

Counsel called no witnesses for the defense. His only other participation was during the closing argument, which was rendered after the prosecutor waived opening argument and which occupies seven pages of transcript. R. 207–13. Between pages 207 and 211, Counsel argued on behalf of Gill, stressing his absence from the apartment at the time the arrest and search were made and urging that he could not be guilty of possession of heroin as a result. Counsel's only reference to petitioner in the entire "guilt" phase of the trial comes thereafter in his closing argument:

"The State has just not proved beyond a reasonable doubt that Buddy Gill pos-

*v. United States,* 298 F.2d 461 (5th Cir. 1962); *MacKenna v. Ellis,* 280 F.2d 592 (5th Cir.), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78

(1960); *cf. Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

sessed any heroin out there on the 30th day of August of 1972. Now, as to the girl, I have complained about the search warrant being bad. I will have to admit and I won't sit here and try to insult your intelligence. It is a different story with her. She was there in the apartment and those Officers claimed the drugs were there. Now, I never really understood exactly what connection she had with the drugs. I will have to leave that to you all. I will be honest with you, I can't remember exactly how that went there. I got a little confused because, as I say, I was standing up and objecting and all that and I hope I didn't offend anybody by that. That's my job to do that. There are technical questions about search warrants and things and that's my job to object to the introduction of evidence that I consider, in my opinion, inadmissable (sic). But now, what connection she had with any drugs there, I will have to admit that kind of slipped my mind but before you can find her guilty, you have to find what the Judge says, that is you have to find that she and she alone possessed or at least she had the care, custody and control and management of these items in question. Like I say, I am not going to sit here because I am a little blank as to exactly what they said, and I will have to leave that to you. I will have to leave it to you on this point, as to whether or not in your opinion, beyond a reasonable doubt, they proved that she had care, custody, control and management of these items."

R. 211–12.

### C. Trial—"Sentencing" Phase

The jury found petitioner guilty and Gill not guilty. *State of Texas v. Maxon and Gill,* Cause No. 184,331 (174th Judicial District Court, Harris County, Texas, March 6, 1973). During the sentencing phase of the trial, Counsel called only the petitioner as a

witness. She indicated that she was a first offender, R. 227, and on cross-examination, she was forced to admit that Gill did reside with her at the apartment in question, R. 229, apparently contradicting for the first time testimony adduced during the "guilt" phase by Counsel on cross-examination of the landlord. R. 195–96.[2] Petitioner further admitted that she had previously been addicted to drugs and was currently on a methadone program, and that she was supporting herself and her husband by working in a nude modeling studio. R. 231–34. The jury sentenced petitioner to ten (10) years imprisonment. The Texas Court of Criminal Appeals affirmed the conviction. *Maxon v. State of Texas,* Cause No. 48,212, 507 S.W.2d 234 (Tex.Cr.App.1974).

### III. POST–CONVICTION HEARING: COUNSEL'S APPRAISAL OF THE EFFECTS OF JOINT REPRESENTATION

Petitioner filed a post-conviction application for writ of habeas corpus in the convicting court in June, 1974, and a hearing was held on the application on June 13, 1974. Counsel was the only witness called. On direct examination, he indicated that he had never inquired of petitioner or Gill as to whether a conflict of interests existed, nor had he discussed with them the possibility of having separate counsel. The following colloquy then took place.

"Q: Did you ever in the trial of this case feel impaired or fettered in your representation of Miss Maxon?

"A: As I stated before to you, when I went to argue to the Jury, I could see that *I couldn't very well blame Buddy Gill or blame Donna's problems on Buddy Gill since I represented both of them,* so I can say during the Jury argument *if I had represented Donna only I would have blamed Buddy Gill* and if I had been representing Buddy Gill only I would have blamed Donna Maxon, but since

2. The District Attorney in fact emphasized strongly during closing arguments in the sentencing phase his view that Gill was the real culprit, R. 195, but faced with only one defendant who was eligible for sentencing, he proceeded to remind the jury frequently of the amount of heroin involved in arguing for a sentence against petitioner. R. 196, 197, 200.

I represented both of them I had to try to get both of them out of it and I couldn't badmouth either one of them.

"Q: So what you are saying is that there [were] certain tactics you couldn't employ on behalf of Miss Maxon because of your representation of Mr. Gill?

[whereupon the Court overruled an objection]

"A: Just like I said, when I got ready to argue to the Jury, I couldn't very well blame anything on Buddy because I was representing him like I couldn't blame anything on Donna since I was representing Donna."

(emphasis added)

(Tr. 4–5, Hearing on Post-Conviction Writ of Habeas Corpus).

On cross-examination, Counsel testified that any discussion of conflict-of-interest with petitioner did not occur to him during trial; indeed, it only occurred to him when petitioner's post-conviction counsel suggested it to him prior to the start of the state court hearing on the application. Counsel further indicated that "in hindsight if they walked in my office today I would tell each of them to get a different lawyer." (Tr. 7 Hearing on Post-Conviction Writ of Habeas Corpus). However, because neither client

indicated to him before the trial a desire to blame the other for the commission of the offense charged, the issue of conflict-of-interest never entered Counsel's mind during that period of time. Counsel stated that he did not feel justice had been done in the case. *Id.* at 11.

Counsel amplified upon the extent to which the conflict-of-interest produced damage to petitioner's case in his mind while he was making his presentation during the sentencing phase.[3] Counsel concluded by explaining that his trial tactics— i.e., to show that Gill was not present and therefore did not reside at the apartment when and where the drugs were found— closed off a crucial strategic avenue during the sentencing phase.[4]

The trial court denied petitioner's post-conviction petition for writ of habeas corpus,[5] and this denial was affirmed without written order by the Texas Court of Criminal Appeals on June 26, 1974. Petitioner thus has exhausted all available state remedies.

## IV. THIS COURT'S APPRAISAL OF THE INSTANT CONFLICT-OF-INTEREST

### A. *The Strategy Adopted by Counsel*

On the basis of the evidence contained in the record including Counsel's sworn rendi-

---

**3.** "Q: Mr. Shaw, did you feel at a disadvantage at all in presenting the case on punishment to the Jury because you had represented Mr. Gill and Miss Maxon jointly?

"A: Well, we run into the same thing. If I was arguing to the Jury and representing only Donna I would have blamed Buddy, just like I would in the guilt or innocent stage. That's a tactic but since I was representing both of them I couldn't use that tactic. Yes, I realize I had to give up that tactic in arguing to the Jury on punishment and on guilt."

(Tr. 12, Hearing on Post-Conviction Writ of Habeas Corpus.)

**4.** "Q: And it is your testimony that you still felt compelled not to blame one or the other (during the sentencing phase)?

"A: I would have felt pretty ridiculous saying to the Jury now you have found him not guilty and her guilty but he is really the bad guy.

"Q: But that was a disadvantage in not using that tactic?

"A: Yes, in arguing Buddy's innocence in the first stage of the trial I certainly would think the Jury would not look favorably on me in turning around in the punishment and blaming it on Gill."

(Tr. 14, Hearing on Post-Conviction Writ of Habeas Corpus.)

**5.** At the post-conviction hearing in the state court, the trial judge stated frequently his recollection of the evidence to the effect that petitioner had actual possession of the goods and that Gill had only constructive possession. (Tr. 15, Hearing on Post-Conviction Writ of Habeas Corpus). Indeed, the Court there seems to have based its denial of post-conviction relief, in part, on what it viewed to be the relative strength of the State's case against petitioner, and the relative weakness of the case against Gill. (*Id.* at 22–23.)

tion of his version of his representation in the case, the Court is able to reconstruct the situation which confronted Counsel before trial. Petitioner and Gill, as common law husband and wife, resided in the same apartment. Gill was apparently well-known to law enforcement officials as a peddler of narcotics, and the police were anxious to bring him to justice. On the day Gill's apartment was raided, however, Gill was not at home, and petitioner, a former addict trying to rid herself of addiction, was found in the apartment, caught almost literally "holding the bag." She was arrested because of the presence of the heroin in the apartment. Some two hours later, Gill returned home and was arrested on his arrival.

As articulated by Counsel, the theory upon which Gill's defense was based was one of Gill's coincidental arrival at the apartment and his lack of possession of the contraband—i. e., Gill did not reside in the apartment, was only an acquaintance of petitioner and had no knowledge of the presence of heroin. The effect, whether intended or not, of introducing such a theory was to shift the spotlight away from Gill entirely and focus it solely upon petitioner as the only person found to be in proximity to the contraband. Indeed, Counsel wedded himself to this theory so firmly during the "guilt" phase that its momentum carried him into the "sentencing" phase and precluded his raising a serious attack on petitioner's behalf, even though she stood alone before the jury for sentencing. *See* notes 3 and 4, *supra.*

### B. Impact of this Strategy on Petitioner's Defense

No one theory stands out as the logical hypothetical rendition of a proposed defense for petitioner, and the Court will not attempt to articulate one or second-guess Counsel's handling of the case. Nevertheless, the Court cannot rule out the possibility that *some* defense might have been available for petitioner. Clearly, an attorney representing only petitioner would not have felt compelled to maintain loyalty to

Gill and would therefore likely have explored avenues pointing up directly Gill's alleged involvement in the affair with a view towards re-focusing the inculpatory spotlight in the case. Counsel's own testimony at the post-conviction hearing demonstrates this. *Accord, Foxworth v. Wainwright, supra,* 516 F.2d at 1079–80 & n.17; see Part III, *supra.*

Apart from the post-trial concession, the record of the trial is devoid of any testimony on petitioner's behalf or exculpatory to her. Instead of a defense there is only silence. Indeed, the few remarks made by Counsel during argument concerning petitioner, *see* Part II.B., *supra,* have the sole effect of detracting from her cause.

### C. Conspicuousness of the Conflict

■ The transcript of the trial of this case stands as a compelling document of a proceeding thoroughly tainted by a fundamental conflict between petitioner's interests and those of her co-defendant. When augmented by the testimony adduced at the post-conviction hearing, the trial comes into proper focus as a case containing a conflict-of-interest between co-defendants from the moment of arrest, which conflict was, or should have been, reasonably apparent by the time of trial to all persons connected with such trial.

The prefatory facts surrounding the case as introduced during the initial trial testimony point to the presence of only one person, petitioner, in close proximity to the contraband at the time of arrest. The scope and content of the cross-examination of the landlord by Counsel during the State's presentation of its case-in-chief introduce a theory designed to cause the jury to consider the exculpatory benefits of such evidence to Gill alone and trigger, at the very least, the suspicion that only petitioner stood before the police as being inculpated in a criminal act at the time of arrest.

Such events strain to the limit the resiliency of petitioner's rights to due process and effective assistance of counsel, and these safeguards were shattered by the impact of Counsel's closing argument during

the "guilt" phase of the trial. Indeed, the text of this argument, see Part II.B.3., supra, standing alone, bears sufficient force to make overwhelmingly manifest to any courtroom spectator at that moment, including the trial judge, the obvious conflict extant in Counsel's joint representation of petitioner and Gill.

## V. PROTECTION OF THE FOURTEENTH AMENDMENT

### A. Introduction

■ Counsel was retained, not appointed, in this state court case. A preliminary inquiry is therefore necessary in the wake of Fitzgerald v. Estelle, supra, to ascertain whether the protection of the Fourteenth Amendment may properly be invoked in this case on due process and/or state action grounds. Alvarez v. Wainwright, supra, 522 F.2d at 104–05.

### B. State Action; Sixth Amendment

#### 1. Involvement of the Trial Court

■ The overt participation or involvement of state officials, such as the trial judge or the prosecutor, has not been demonstrated on the record in this case, as it was demonstrated in Alvarez v. Wainwright, supra, 522 F.2d at 105. However, the Court concludes that the conflict was reasonably apparent in this case from the record and should have been foreseen by the trial judge. Cf. Foxworth v. Wainwright, supra, 516 F.2d at 1076. With requisite state action therefore present, the petitioner's Sixth Amendment rights are invoked by incorporation through the Fourteenth Amendment, and the Court will proceed to consider whether petitioner enjoyed reasonably effective assistance of counsel as required by the Sixth Amendment.

#### 2. Sixth Amendment Standard Applicable

■ Ever since 1942, the Supreme Court has required as a matter of constitutional Sixth Amendment law that an attorney offer untrammeled and unimpaired assistance free of any detrimental conflict of interest. Glasser v. United States, supra, 315 U.S. at

70, 62 S.Ct. 457, quoted in Foxworth v. Wainwright, supra, 516 F.2d at 1076. The right to counsel guaranteed by the Sixth and Fourteenth Amendments is a right to effective counsel. Herring v. Estelle, supra, 491 F.2d 125; MacKenna v. Ellis, supra, 280 F.2d 592. As the United States Court of Appeals for the Fifth Circuit has emphasized, "effectiveness" is not a matter of professional competence alone. Castillo v. Estelle, supra, 504 F.2d at 1245.

■ The Fifth Circuit has stated that a conflict of interest is present "whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing." Foxworth v. Wainwright, supra, 516 F.2d at 1076. Where, before trial, a conflict of interest exists and, after trial, counsel betrays his lack of allegiance to one defendant, a reviewing court is required to look no further for specific prejudicial action at trial. Gravitt v. United States, supra, 523 F.2d at 1219. The existence of an actual, significant conflict forecloses any further inquiry, including a determination of whether the conflict was "prejudicial" to a petitioner's rights. Foxworth v. Wainwright, supra, 516 F.2d at 1077 n.7 citing Baker v. Wainwright, 422 F.2d 145, 149 (5th Cir. 1970).

■ The Constitution assures a defendant of effective representation by counsel, and such representation is lacking if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents—as a vigorous advocate having the single aim of acquittal by all means fair and honorable—are hobbled or fettered or restrained by commitments to others. Porter v. United States, supra, 298 F.2d at 463.

#### 3. Applying the Sixth Amendment in this Case

■ The Court has little difficulty in concluding that Counsel did not effectively assist the instant petitioner consonant with

the demands of the Constitution. The facts of this case as adduced at the post-conviction hearing before the trial court and as illustrated in the trial transcript by Counsel's conduct of the "guilt" and "sentencing" phases of the case-in-chief readily demonstrate, as Counsel conceded at the post-conviction hearing, that petitioner's position was essentially sacrificed for the sake of Gill. Actually, the record strongly demonstrates that Counsel paid scant attention to petitioner's legal rights and strategic needs, indeed mostly as an afterthought, and never consulted with her as to the problems interwoven in his representation of her. Even after petitioner had been found guilty by the jury and was faced with the prospect of a long prison sentence being imposed by the same jury, the evidence demonstrates that Counsel, though recognizing petitioner's predicament, continued to concentrate upon, and advocate, only testimony consonant with the position of the acquitted co-defendant. Counsel's assistance in this case therefore contravenes the requirements of the Sixth Amendment. *See* Part V.B.2., *supra,* and cases cited therein.

### C. Fundamental Unfairness

#### 1. Introduction

The *Fitzgerald* case permits a court to determine as well whether a trial involving retained counsel was so fundamentally unfair as to violate Fourteenth Amendment due process. This Court concludes from the record that the instant trial also violated petitioner's Fourteenth Amendment due process rights.

#### 2. Conflict-of-Interest: Per Se Fundamentally Unfair?

##### a. Porter v. United States

The boundaries of "fundamental fairness' cannot be demarcated precisely. The *Fitzgerald* court cited *Porter v. United States,* the prototype conflict-of-interest case, as a "good example" of fundamental unfairness, i. e., as an example of the failure of the state criminal justice system to function properly so as to convert the imprisonment of a state defendant into a fundamental wrong. 505 F.2d at 1336 & n.2. Such a citation would seem to indicate that within the class of cases generally challenging effective assistance of counsel, *every* conflict-of-interest case, whether involving a retained or an appointed counsel, would always constitute an example of fundamental unfairness violative of Fourteenth Amendment due process.

#### b. Applicability of Porter in Light of Foxworth

##### (1)

However, applying a per se rule of Fourteenth Amendment violation in a conflict-of-interest case may not be appropriate in view of the language used by a more recent appellate panel in the *Foxworth* case, 516 F.2d 1072. In that case, a federal habeas corpus petitioner challenged the effectiveness of the representation of his appointed attorney who jointly represented him and two co-defendants. Since counsel was appointed, state involvement was automatic, and the panel proceeded directly to consider whether the petitioner's Sixth Amendment right to counsel had been violated without attempting to measure the events of the trial against a standard of fundamental fairness.

Yet, even with the "lesser" standard of "reasonably effective counsel" to be applied, e. g., *Herring v. Estelle, supra,* 491 F.2d 125; *MacKenna v. Ellis, supra,* 280 F.2d 592, which according to the *Fitzgerald* court encompassed a greater range of counsel errors, 505 F.2d at 1336, the *Foxworth* court stated that joint representation by appointed counsel does not inherently deprive a defendant of effective assistance. 516 F.2d at 1076. The appellate court then proceeded to imply in footnote 5 on the same page that the continuing viability of *Porter* was in doubt but that such viability would not be resolved in that case. 516 F.2d at 1076 n.5.

##### (2)

The *Foxworth* court was immediately concerned in footnote 5 with the question of

whether as a matter of due process in a conflict-of-interest case co-defendants have a right to be warned, and a trial judge has a corresponding duty to warn, of the disadvantages of joint representation. The court concluded that the judge has no such duty.

The court then proceeded to frame the question of the standard of "foreseeability" to be imposed upon a trial judge—i. e., whether a trial judge is to be held responsible for failing to foresee even those conflicts-of-interest which are not reasonably apparent on the theory that a conviction resulting from an unfair trial cannot be upheld, irrespective of blame. 516 F.2d at 1076 n.5. Having framed the question, indicating that it was raised by language in the *Porter* case, 298 F.2d at 464, the *Foxworth* court refused to answer it, stating: "Because we believe the conflict was reasonably apparent in this case we need not consider whether *Porter* is still viable." 516 F.2d at 1076 n.5. (emphasis added)

(3)

Three conflict-of-interest rules were established in *Porter*: (1) no distinction between retained and appointed counsel; (2) fundamental unfairness of a trial conducted by an attorney who, unknown to his neglected client, represents him in a duplicitous manner; and (3) duty of foreseeability imposed upon a trial judge to correct "conflict" errors regardless of whether he is fully cognizant of the nature and extent of the conflict. 298 F.2d at 463–64. *Fitzgerald* clearly abolished the first *Porter* rule and, in footnote 2, clearly approved the second *Porter* rule. 505 F.2d at 1336 n.2.

The third *Porter* rule is ostensibly the one addressed by the *Foxworth* court and the one whose continued viability was there placed in doubt. However, creating doubts about the third rule has the effect of 'automatically creating doubts about the viabili-

ty of the second because the *Porter* court discussed fundamental unfairness and trial judge duties together:

"A Court may not countenance [duplicitous joint representation] and must, on the contrary, take effective action just as we are certain the careful Judge below would have done had the facts been known at or before the commencement of the criminal trial. But where this has been allowed to occur, either through a calloused conscience of the attorney, or ignorance of the true facts by the Judge, *the trial is not the fair one demanded by the Constitution.*" (emphasis added)

298 F.2d at 464. Thus, even in the face of the approving citation of *Porter's* second rule by the *Fitzgerald* court, the subsequent comments on *Porter* by the *Foxworth* panel at least cast doubt upon the continuing eligibility of its second rule to be applied in a *per se* manner.

### 3. *Fundamental Unfairness on the Facts of This Case*

■ With the law in such a posture at this time, this Court feels compelled not to apply *Porter* in a per se manner but rather to evaluate the facts of this case for their fairness. When viewed and analyzed thoroughly, *see* Part IV.B., *supra*, these facts demonstrate conclusively to this Court that the trial of petitioner was fundamentally unfair. The Court recognizes that before trial Counsel was approached to be retained by petitioner and Gill together and that in view of their common-law relationship they desired to be represented together.

■ Yet, the questions of whether petitioner would have accepted separate counsel or whether with separate counsel petitioner would have been willing to abandon her loyalty to Gill at trial are not relevant to resolving the basic issue presented here.[6]

---

6. The holding in *Gravitt v. United States, supra*, where two brothers were jointly represented and one brother later attacked the fairness of the proceeding, indicates that even closely related co-defendants can suffer deprivation of due process and violation of Sixth Amendment rights arising out of a conflict-of-interest. 523 F.2d at 1217–19.

Indeed, the facts of the instant case illustrate one difficulty in imposing differing legal burdens upon state habeas corpus petitions based upon a distinction between "retained" versus "appointed" counsel. Where a defendant such

Rather, the issue is fundamental fairness of the trial as far as petitioner is concerned. See *Foxworth v. Wainwright, supra,* 516 F.2d at 1079–80 & n.16, 17. Where petitioner was represented in such a manner as to have no defense presented, the trial was fundamentally unfair. Even if only the "sentencing" phase were the trial segment in issue as allegedly being tainted by Counsel's conduct, *cf. Gravitt v. United States, supra,* 523 F.2d at 1219, such sentencing was fundamentally unfair and violated due process.

■ Under Texas law, the invalidation of a sentence operates to rob a "guilt" phase conviction of its vitality and dictates that the entire result be stricken and that petitioner be entitled either to release or re-trial. *Ex Parte Olvera,* 489 S.W.2d 586, 590 (Tex.Cr.App.1973) *citing Ocker v. State,* 477 S.W.2d 288 (Tex.Cr.App.1972).

## VI.  CONCLUSION

Petitioner's Application for Writ of Habeas Corpus is therefore granted, and the writ is issued. Petitioner's conviction and sentencing in Cause No. 184,331, rendered on March 6, 1973, in the 174th Judicial District Court of Harris County, Texas, are invalid as violative of the Sixth and Fourteenth Amendments to the United States Constitution. Respondent is to be afforded the opportunity to re-try petitioner within ninety (90) days from the date of this order, if it so chooses. If no proceedings are commenced against petitioner in the proper forum within 90 days, petitioner is to be released.

DONE at Houston, Texas, this 21st day of June, 1976.

as the instant petitioner is tried jointly with another accused and they adopt deliberately a strategy of fraud or collusion on their own, with counsel or by their selection of counsel, so as to ensure the manufacturing of a defective record based upon a knowingly induced conflict-of-interest, no federal habeas corpus relief should lie. *Fitzgerald v. Estelle, supra,* 505 F.2d at 1345 (Godbold, J., dissenting). It should be noted that the above "collusion" could conceivably be accomplished by co-defendants regardless of whether counsel is appointed or retained. Also, under certain circumstances an accused may waive the right to "conflict-less" counsel. *United States v. Garcia,* 517 F.2d 272, 277 (5th Cir. 1975). Where, on the other hand, as the facts of the instant case seem to illustrate, an accused agrees to joint representation relying upon her co-defendant or her retained attorney in ignorance of the law and despite the presence of a significant conflict-of-interest, it is this ignorance, not the fact of ability or lack of ability to hire counsel, which sets in motion the events which ultimately prejudices her rights. Such ignorance compounds itself where counsel, whether appointed or retained, obscures the conflict knowingly or unknowingly by refusing to apprise the accused of it or by failing to recognize it.

No presumption should attach solely by the act of retention that a retained attorney is more likely to communicate with his client because he has been paid; no presumption should attach that the client will be more likely to exert control over the conduct of retained counsel solely through payment of a retainer.

This case demonstrates the difficulties which accrue in applying such presumptions. Petitioner was ignorant of her rights, unaware of Counsel's decision to abandon her tactically and adopt a strategy solely advocative of her co-defendant's cause and further aware of the mutually exclusive nature of her legal interests and those of Gill. She did not participate in any way in creating the conflict-of-interest and did not even appreciate, as Counsel did not, its full significance until after sentence was handed down.

Where petitioner thus takes no steps to contribute to, or take advantage of, a conflict-of-interest, practically she becomes as powerless to act or to be responsible for her counsel's conduct as does a person who is indigent and must accept the representation of appointed counsel. Absent any involvement of state officials, she should still be entitled to reasonably effective assistance in a conflict-of-interest situation and should not be saddled with having to meet the burden of demonstrating fundamental unfairness solely through the act of her co-defendant's retention of counsel. *See* Note, 89 Harv. L.Rev. 593 (1976).