John Buford IRVING, III, Petitioner,

v.

Steve HARGETT, Warden, Mississippi
State Penitentiary, et al.,
Respondents.

No. WC 79–75–OS–O.

United States District Court,
N. D. Mississippi, W. D.

July 24, 1981.

Leonard McClellan, Oxford, Miss., for petitioner.

Catherine Walker Underwood, Jackson, Miss., for respondents.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is a habeas corpus action brought by petitioner John Buford Irving, III, who challenges the constitutionality of his conviction and sentence for capital murder in the state courts of Mississippi. On November 12, 1976, Irving, after a jury trial in the Circuit Court of Pontotoc County, was convicted of capital murder of Gambrell Ray[1] and sentenced to suffer death in the gas chamber at the Mississippi State Penitentiary.

Irving, then 20 years of age, was the first defendant to be tried, convicted, and sentenced under the bifurcated procedure promulgated by the Mississippi Supreme Court in *Jackson v. State*, 337 So.2d 1242 (Miss. 1976). His conviction and sentence were

---

1. Ray was killed at about 8 p. m. on March 3, 1976, during a robbery, which constitutes capital murder under Mississippi law. See Miss. Code Ann. § 97–3–19 (1980 Supp.). Irving was identified as the assailant by Mrs. Ray, who had known him for a number of years. In addition, Irving confessed to the murder in a statement given to Sheriff Hubbard in the presence of the county attorney and the Pontotoc Chief of Police. See note 4, *infra*. The details concerning Ray's murder may be found in the Supreme Court's opinion at 361 So.2d 1360.

affirmed on direct appeal to the state supreme court,[2] and certiorari was denied by the Supreme Court of the United States on April 16, 1976.[3]

After exhausting available state remedies, Irving filed his present petition seeking to vacate his conviction and order his release from state custody. Consistent with the prayer for general relief, Irving's counsel, who also represented Irving at trial, argues that, if the conviction is not set aside, the sentence of death should be vacated and reduced to life imprisonment.

### 1. Contentions

■ Irving attacks his conviction and/or sentence on the following grounds:

1. A coerced confession was admitted in evidence.[4]

2. The exclusion from the jury of persons holding views in opposition to the death penalty violated his constitutional right to a fair trial.

3. The imposition of the death penalty under judicially-established procedures deprived him of life without due process of law and subjected him to cruel and unusual punishment.

4. He was denied effective assistance of counsel because the trial court required him to proceed at trial with counsel having a conflict of interest arising from their dual representation of Irving and a codefendant, Keith Anthony Givhan.

5. The death penalty procedure under which he was tried and sentenced was not in effect on the date of the crime and therefore constituted an ex post facto law.

6. The death penalty is administered in Mississippi in a discriminatory manner.

7. The procedure under which he was sentenced did not adequately channel jury discretion because it failed to properly define "aggravating" and "mitigating" circumstances and precluded meaningful appellate review.

8. He was not apprised of the standards and guidelines used by the state supreme court in reviewing death sentences.

9. His request to be examined by a psychologist prior to sentencing was denied.

After an evidentiary hearing conducted by the United States Magistrate, a report and recommendation was submitted in which the magistrate recommended that Irving's death sentence be vacated on the basis of his third claim, *supra*. The magistrate specifically rejected Irving's claims based upon conflict of interest, coerced confession, and discriminatory imposition of death penalty, and found it unnecessary to consider petitioner's other claims. Timely objections to the magistrate's report were filed by petitioner and respondents, and, having reviewed the state trial transcript and the transcript of the hearings before the magistrate, we adopt in part the magistrate's recommendation, and for different reasons than he assigned, set aside the death sentence and remand to the Circuit Court of Pontotoc County for resentencing in accordance with state law.[5] Our findings of fact and conclusions of law, pursuant to Rule 52(a), F.R.Civ.P. follow.

### II. *Witherspoon* Issue

Irving maintains that excusal of two jurors constituted a violation of his constitutional rights as established by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20

---

**2.** *Irving v. State*, 361 So.2d 1360 (Miss.1978).

**3.** *Irving v. State of Mississippi*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).

**4.** This claim may be summarily disposed of on the facts. At an evidentiary hearing held on Irving's motion to suppress his oral statement given to Sheriff Hubbard on March 4, 1976, the trial judge found as fact that no threats or promises were made to Irving in order to obtain a statement and that the accused was fully and adequately advised of his constitutional

rights before being questioned and that he understood his rights after having been so advised. Since none of the circumstances enumerated in 28 U.S.C. § 2254(d)(1)–(7) are present and the trial court's findings are fairly supported by the record, these findings are binding on us.

**5.** This case was reassigned to Chief Judge William C. Keady on June 12, 1981, on account of the physical incapacity of District Judge Orma R. Smith.

L.Ed.2d 776 (1968) because the trial court failed to ascertain with certainty that the prospective jurors' convictions against the death penalty were so strong as to fall within the limited circumstances when jurors may be excused for cause because of objections to the death penalty.

### a. Facts

On voir dire examination, the court stated;

First of all, you have been summonsed as jurors in a capital case. And a verdict of guilty could result in the infliction of the death penalty.

Does any member of the panel have any conscientious scruples against the infliction of the death penalty when the law authorizes it in proper cases and where the testimony warrants it? If so, if you have such conscientious scruples under those circumstances, would you please stand?

All right. Let me start with the front row.

[Whereupon Mrs. Mae Duffie rose.]

All right. Mrs. Duffie, listen carefully to what I'm going to ask you. I ask you whether or not you could, nevertheless, follow the testimony and the instructions of the Court and return a verdict of guilty, although that verdict could result in the death penalty, if you, being the judge of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict?

JUROR DUFFIE: Well, I believe anybody should be punished, but I just can't go through with it.

THE COURT: Are you telling me that you cannot follow the instructions of the Court and return a verdict of guilty since that verdict could result in the death penalty?

JUROR DUFFIE: Well, I don't believe in the death penalty.

THE COURT: Will you just listen to my question, carefully and try to give me a yes or no, please ma'am. I'm going to read it again.

I ask you whether or not you could, nevertheless, follow the testimony and the instructions of the Court and return a verdict of guilty, although that verdict could result in the death penalty, if you, being the judge of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict? Yes or no?

JUROR DUFFIE: I guess yes.

THE COURT: All right. Be seated, please ma'am.

Tr. Trans. at 72–73.

Later during voir dire examination by District Attorney Young, Mrs. Duffie again spoke up.

YOUNG: Yes, ma'am, I believe you are Mrs. Mae Duffie.

You had spoken up earlier, I believe. Do you feel that you cannot sit in judgment of your fellow man?

JUROR DUFFIE: I just don't believe in capital punishment.

YOUNG: Yes ma'am. I'm going to get a little bit further into that.

THE COURT: Counsel, let me ask her the question again. This is Mrs. Mae Duffie.

Listen to my question once again. I have asked you before, and you have stated that you do not believe in capital punishment. I ask you whether or not you could, nevertheless, follow the testimony and the instructions of the Court and return a verdict of guilty, although that verdict could result in the death penalty, if you, being the judge of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict? Yes or no?

JUROR DUFFIE: No, I don't believe I could.

THE COURT: All right. You will be excused for cause . . . .

YOUNG: Is there anyone else that, concerning this question about sitting in judgment of their fellow man, is there anyone else that has this belief or feels it?

[Whereupon Mrs. Leroy Thomason rose]
JUROR THOMASON: I don't believe in it .... I don't—I could sit in there with a murderer, but I mean, capital punishment, I just don't believe in that.

THE COURT: All right. Now, listen to me, Mrs. Thomason. You have stated to the Court that you do not believe in capital punishment. Listen to my question very carefully. I ask you whether or not you could, nevertheless, follow the testimony and the instructions of the Court and return a verdict of guilty, although that verdict could result in the death penalty, if you, being the judge of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict? Yes or no?

JUROR THOMASON: No.

THE COURT: All right. Thank you. You may be excused.

Tr. Trans. at 86–88.

Petitioner argues that the excusal of these two individuals constitutes a violation of the *Witherspoon* doctrine because the prospective jurors' answers to the court's inquiries did not make it unmistakably clear that they would be unable to inflict the penalty of death under all circumstances. In effect, petitioner's argument is that the trial court lead the prospective jurors in their answers by restricting them to "yes" or "no" answers.

### b. Law

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court, considering an Illinois statute which allowed challenges for cause whenever a prospective juror "has conscientious scruples against capital punishment, or . . . is opposed to the same," held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 784–85. In explaining the parameters of its holding, the Court noted:

The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion . . . .

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case.

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21 (emphasis original)

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court held that the *Witherspoon* test had been met when prospective jurors responded to the following question by answering that they would not "take the oath":

"[D]o you feel that you could take an oath to well and truely [sic] try this case . . . and follow the law, or is your conviction so strong that you cannot take an oath, knowing that a possibility exists in regard to capital punishment?"

The Court stated that these prospective jurors were properly excluded under *Witherspoon* since each "make it 'unmistakably clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge." *Id.* at 596, 98 S.Ct. at 2960, 57 L.Ed.2d 973, 984.

The court recently summarized *Witherspoon* and its progeny as follows:

> This line of cases established the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980).

In the case sub judice, the trial court followed to the letter the procedure established by the Mississippi Supreme Court in *Armstrong v. State*, 214 So.2d 589, 593 (Miss.1968), wherein the court stated:

> The proper method of bringing the death penalty to the attention of the special veniremen is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of the death penalty. The judge should then ask them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released. The mere fact that a venireman is opposed to the death penalty does not disqualify him as a juryman, if he can do his duty as a citizen and juror and follow the instructions of the court, and where he is convinced of the defendant's guilt he can convict him although the verdict of the jury may result in the death penalty's being inflicted upon the defendant.

See also *Myers v. States*, 254 So.2d 891 (Miss.1971).

■ Since the prospective jurors could not or would not follow the law and evidence in the case, notwithstanding their personal convictions, it was the court's duty to excuse them. The court's inquiry regarding this matter was repeated many times in the course of voir dire, and, if the jurors did not understand the question or wished to elaborate beyond a simple "yes" or "no" answer, we have no doubt that they would have so stated. Accordingly, habeas relief is not available based upon Irving's *Witherspoon* challenges.

### III. Judicial Repair and Constitutionality of the *Jackson* Procedure

#### a. *Facts*

In 1974 the Mississippi Legislature, responding to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), enacted Ch. 576, Miss.Laws (1974), which substantially modified Mississippi's statutory scheme for imposition of the death penalty. The Act was described in its title as "establish[ing] a class of crimes known as capital murder and . . . provid[ing] the penalty of death as punishment therefor." 1974 Miss.Laws at 864.

The 1974 Act amended § 97–3–21, Miss. Code Ann. to read in part as follows: "Every person who shall be convicted of capital murder shall be sentenced by the court to death." Subsection 3, § 6 of the Act, later codified as § 99–17–20, provided, *inter alia*:

The judge, in cases where the offense cited in the indictment is punishable by death, shall grant no instruction for the state or the defendant which instructs the jury as to their discretion to convict the accused of the commission of an offense not specifically set forth in the indictment returned against the accused.

In the first case to reach it under the new Act, the Mississippi Supreme Court noted that § 97–3–21 made capital punishment mandatory. *Stevenson v. State*, 325 So.2d 113, 115 (Miss.1975). Less than a year later, the Supreme Court of the United States handed down a series of decisions establishing guidelines within which the death penalty may be constitutionally imposed [6] and holding mandatory death sentence statutes to be in violation of the eighth and fourteenth amendments to the United States Constitution.[7]

On October 5, 1976, the Mississippi Supreme Court decided *Jackson v. State*, 337 So.2d 1242 (Miss.1976), in which it recognized the necessity to reevaluate the Mississippi death penalty statutes in light of these decisions. The Mississippi court noted that *Furman* had been widely interpreted as meaning "that the penalty of death, if applied at all, must be made mandatory upon the conviction of certain offenses." *Id.* at 1250. Since Mississippi had not had a mandatory death penalty from 1875 until the *Furman* opinion was "construed to forbid the exercise of any discretion by the judge or jury in deciding whether a defendant convicted of certain offenses would suffer death," *id.* the court concluded that "the dominant intent of the legislature in 1974 was to enact a death penalty statute that would meet what were then considered to be constitutional requirements." *Id.* at 1251.

In order to effectuate this legislative intent, the court construed § 97–3–21 as merely allowing, and not requiring, the imposition of death in certain circumstances. *Id.* Recognizing the rule that "when the Court is confronted with a statute a literal construction of which would render it unconstitutional, the Court must adopt such a construction, when reasonably possible, as will save the statute, and at the same time save every savable provision or term of it," [8] and noting that the word "shall" may be construed as permissive rather than mandatory, the court concluded as follows:

> We therefore construe the second sentence of Section 97–3–21 to mean that every person convicted of capital murder shall be sentenced to death if that be the verdict of the jury after the defendant has been accorded a trial governed by procedures and guidelines designed to prevent the risk that the death penalty would be inflicted in an arbitrary and capricious or freakish manner. Such a construction is reasonable and proper and is necessary to carry out the dominant intent and purpose of the legislature.

*Id.*

The court next proceeded to establish safeguards and guidelines constitutionally required before an accused could be subjected to the death penalty. The court's conclusions may be summarized as follows:

1. Cases involving the death penalty must be bifurcated into a guilt-finding phase and a sentence-determining phase.

2. Conviction of the capital offense charged constitutes sufficient grounds to authorize imposition of the death penalty unless mitigating circumstances shown by the evidence outweigh the aggravating circumstances.

3. Defendant may adduce proof of any circumstances surrounding his life and

---

6. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

7. *Woodson, supra; Roberts, supra.*

8. *Id.* (Quoting *Teche Lines, Inc. v. Danforth*, 195 Miss. 226, 12 So.2d 784 (1943).

character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or life in prison even if such evidence would not have been admissible on the question of guilt.

4. Before the jury may return a verdict that the defendant should suffer the penalty of death, they must find unanimously in writing that, after weighing the mitigating circumstances and the aggravating circumstances one against the other, the mitigating circumstances do not outweigh the aggravating circumstances.

5. Cases in which the death sentence is imposed will be automatically reviewed as preference cases in the Mississippi Supreme Court which will review the record and compare it with similar cases to de-

termine whether the punishment of death is too great when the aggravating and mitigating circumstances are weighed against each other and to assure that the death penalty is not being wantonly or freakishly imposed.

The court found unconstitutional that provision of § 99–17–20 which prohibited the granting of jury instructions concerning lesser included offenses and held that such instructions may be granted only "after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence."[9] *Id.* at 1255.

Since Irving was the first defendant to be tried under the *Jackson* procedure, there was some uncertainty among the attorneys and the trial judge concerning what evi-

---

**9.** On April 13, 1977, the Mississippi Legislature amended § 97–3–21 to read as follows:

Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the state penitentiary.

Every person who shall be convicted of capital murder shall be sentenced to death or to imprisonment for life in the state penitentiary.

1977 Miss.Laws, Ch. 576, § 7, *codified in* Miss. Code Ann. § 97–3–21 (1980 Supp.)

The 1977 Legislature also provided for bifurcation of sentencing proceedings during which the jury must weigh aggravating and mitigating circumstances. 1977 Miss.Laws § 2, *codified in* § 99–19–101. Aggravating circumstances are limited to the following:

(1) The capital offense was committed by a person under sentence of imprisonment.

(2) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.

(3) The defendant knowingly created a great risk of death to many persons.

(4) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy or the unlawful use or detonation of a bomb or explosive device.

(5) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(6) The capital offense was committed for pecuniary gain.

(7) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(8) The capital offense was especially heinous, atrocious or cruel.

§ 99–19–101(5)(a)–(h). Statutory mitigating circumstances are as follows:

(1) The defendant has no significant history of prior criminal activity.

(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) The victim was a participant in the defendant's conduct or consented to the act.

(4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.

(5) The defendant acted under extreme duress or under the substantial domination of another person.

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(7) The age of the defendant at the time of the crime.

*Id.* at (6)(a)–(g). The statutory procedure requires the jury to "designate in writing" the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt." § 99–19–103. The death sentence may not be imposed "[u]nless at least one (1) of the statutory aggravating circumstances enumerated in section 99–19–101 is so found or if it found that any such aggravating circumstance is overcome by the finding of one or more mitigating circumstances." *Id.*

dence would be admissible at the sentencing stage. The State reintroduced all testimony and evidence adduced at the guilt phase and called as an additional witness the circuit clerk of Pontotoc County who testified that on March 11, 1974, Irving, then 18 years of age, plead guilty to an offense of burglary and larceny.

For reasons to be developed *infra*, Irving did not testify on his own behalf at either stage of the trial. Although no defense witnesses testified at the guilt phase, ten individuals were called to testify for Irving at sentencing. These witnesses, who included Irving's mother, several ministers, and family friends, testified that as a child Irving was polite and well-mannered and that he had recently undergone a "spiritual conversion." Several witnesses testified that they thought Irving was capable of reforming his conduct. On cross-examination, Irving's mother stated that he had been suspended from school shortly after desegregation.

At sentencing, the court instructed the jury, *inter alia*, as follows:

Proof beyond a reasonable doubt of the statutory elements of the capital offense with which the accused is charged shall constitute sufficient circumstance to authorize imposition of the penalty of death unless the mitigating circumstances shown by the evidence outweigh the aggravating circumstances. You shall not be required to make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison. However, before you may return a verdict that the defendant . . . should suffer the penalty of death, you must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death.

Tr. Trans. at 682. The jury was further instructed that defendant could "adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life imprisonment," Tr. Trans. at 681, that it could consider "whether the defendant is incorrigible, or not capable of reforming his conduct to the values and standards of society," Tr. Trans. at 679, and that "an accused's prior record of criminal conviction . . . may be considered . . . as an additional aggravating circumstance." Tr. Trans. at 685. The State tendered a general instruction defining mitigating and aggravating circumstances, but it was withdrawn apparently because of defense counsel's objection to any instruction defining such circumstances. Tr. Trans. at 684, 675–76, 686.

The jury's verdict read: "We, the jury, find unanimously, after weighing the mitigating circumstances and the aggravating circumstances, one against the other, that the mitigating circumstances do not outweigh the aggravating circumstances, and that the defendant should suffer the penalty of death."

Based on these facts, Irving contends:

1. that the *Jackson* procedure, being judicially rather than legislatively imposed, deprived him of life without due process of law and subjected him to cruel and unusual punishment;

2. that the use of the *Jackson* procedure at his trial constituted an *ex post facto* law since it was not in effect on the date of the crime;

3. that the procedure under which Irving was sentenced did not adequately channel jury discretion and precluded meaningful appellate review inasmuch as aggravating and mitigating circumstances were not defined; and

4. that he was deprived of due process of law because he was not apprised of the standards and guidelines to be used by the Mississippi Supreme Court in reviewing his sentence.

The magistrate agreed with Irving that the state supreme court's statutory construction in *Jackson* was unreasonable and therefore not binding on the federal courts. Furthermore, he concluded that the *Jackson* construction interjected such vagueness into Mississippi's statutory sentencing procedure as to constitute a denial of Irving's due process rights. Thus, the magistrate found that at the time of Irving's trial, conviction, and sentence, § 97–3–21 made imposition of the death penalty mandatory upon conviction of capital murder, and, this being unconstitutional under *Woodson,* he recommended that we set aside Irving's sentence.

The magistrate also found that the death sentence imposed upon him pursuant to judicially created procedures constituted cruel and unusual punishment because "a capital sentencing procedure promulgated by a court rather than a legislature does not necessarily reflect the contemporary moral values of the people and is vulnerable to eighth amendment attack." Report and Recommendation at 52. Accordingly, the magistrate recommended that Irving's sentence be vacated and that the writ of habeas corpus discharging petitioner issue if the State failed to resentence him according to constitutionally acceptable procedures. For reasons that follow, we disagree with the magistrate's reasoning on this issue.

*b. Law*

■■■ We note initially that state courts are free "to interpret and, where they see fit, to reinterpret" their own state statutes. *Garner v. Louisiana,* 368 U.S. 157, 169, 82 S.Ct. 248, 254, 7 L.Ed.2d 207, 216 (1961). A construction of a statute by the State's

highest court "puts these words in the statute as definitely as if it had been so amended by the legislature." *Winters v. New York,* 333 U.S. 507, 514, 68 S.Ct. 665, 669, 92 L.Ed. 840 (1948). Only a state court may interpret its statutes, as federal courts lack jurisdiction to interpret state legislation. *See Whalen v. United States,* 445 U.S. 684, 687–88, 100 S.Ct. 1432, 1435–1436, 63 L.Ed.2d 715, 721 (1980); *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 413 (1972); *United States v. Thirty-seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822, 830 (1971). Thus, it has been said that "State courts are the ultimate expositors of their own state's laws, and federal courts entertaining petitions for writs of habeas corpus are bound by the construction placed on a State's criminal statutes by the courts of that State except in extreme circumstances." *Mendiola v. Estelle,* 635 F.2d 487, 489 (5 Cir. 1981); *see Rundlett v. Oliver,* 607 F.2d 495, 500 (1 Cir. 1979).[10] The only time a federal court may review a state court's interpretation of its statute is when that interpretation is an "obvious subterfuge to evade consideration of a federal issue." *Mullaney v. Wilbur,* 421 U.S. 684, 685, 691 n. 11, 95 S.Ct. 1881, 1883, 1886 n. 11, 44 L.Ed.2d 508, 511, 515 n. 11 (1975). The Mississippi Supreme Court's interpretation of its death penalty statutes in *Jackson* does not fall into this limited exception to nonreviewability.[11]

The proposition that a state court is free to interpret its statutes in situations analogous to *Jackson* is exemplified by two recent Fifth Circuit opinions involving

10. Furthermore "[w]here, as in the instant case, it is necessary to determine what governmental objectives are sought to be served by a particular state statute, the views of the highest court should also be given careful consideration." *Rundlett, supra.*

11. The *Mullaney* Court cited three cases, which appear to be exhaustive, as instances when a state court's interpretation was not binding on a federal court—*Radio Station WOW v. Johnson,* 326 U.S. 120, 65 S.Ct. 1475, 89 L.Ed. 2092 (1944); *Ward v. Love County,* 253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751 (1919); *Terre Haute &*

*Indianapolis RR v. State of Indiana ex rel Ketcham,* 194 U.S. 579, 585, 24 S.Ct. 767, 768, 48 L.Ed. 1124 (1904). All three of these cases deal with a state court's determination of matters which are of *extreme federal importance. Radio Station WOW, supra* (state court's decision restricted jurisdiction of Federal Communication Commission); *Ward, supra* (state court's decision had effect of taxing Indian lands exempt from taxation by Act of Congress); *Terre Haute, supra* (state court's decision impaired contractual rights of railroad in violation of the United States Constitution).

three Supreme Court decisions [12] which hold that although due process requires the State to prove every element of a criminal offense, it is not required to prove lack of an affirmative defense unless the truth of the defense would necessarily negate an essential element of the crime.

In a habeas case wherein petitioner claimed that the Georgia trial court impermissibly placed upon him the burden of proving insanity, the court held that such a burden was not a due process violation since

> [e]ven if the Georgia statutes make sanity part of the intent element of the state's case, the judicially recognized presumption of sanity removes it from that element and makes it a burden to be carried by the accused. Viewed in this light, insanity is a classic affirmative defense offered in justification for the crime.

*Grace v. Hopper*, 566 F.2d 507, 510 n. 6 (5 Cir.), *cert. denied* 439 U.S. 844, 99 S.Ct. 139, 58 L.Ed.2d 144 (1978). Similarly, in *Holloway v. McElory*, 632 F.2d 605 (5 Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981), the court considered whether a Georgia trial court impermissibly placed on the habeas petitioner the burden of proving self defense on a manslaughter offense. Although the Georgia statutes made lack of self defense an essential element of the crime of manslaughter, the court noted:

> The States, however, are not completely proscribed from modifying through their legislatures *and courts* their criminal laws to reflect changing notions and policies; they may, within substantive fairness limits whose boundaries are not yet precisely marked, redefine the elements of their criminal offenses. In so doing, they may wish to reallocate burdens of persuasion on those issues that they remove from the definition of the crime, thereby converting those issues into matters of mitigation or enhancement.

*Id.* at 624 (emphasis added). In *Holloway*, however, Georgia courts had construed lack of self defense as an essential element of the crime, therefore making defendant's burden of proof unconstitutional under *Winship* and *Mullaney*. *Id.* at 624–35. The court noted, however, that "a change in [Georgia's definitions of its crimes]—by either the *Georgia courts* or the Georgia Legislature—might dictate a different result in future cases." *Id.* at 635 (emphasis added).

▮ Since that which a state legislature has deemed an essential element of an offense may be changed by that state's courts, through statutory interpretation, into an affirmative defense, we think it clear beyond peradventure that state courts may likewise change through interpretation the penalty which an offense may carry. Accordingly, we hold as a matter of law that the Mississippi Supreme Court's interpretation of § 97–3–21 as permissive is not reviewable by us and raises no federal constitutional question.[13]

---

12. *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

13. Since a state court is not required to use the same rules of construction that a federal court might use in interpreting federal statutes, we deem inapplicable the cases relied upon by the magistrate at pages 40–44 of his Report and Recommendation. How this or any other federal court might construe § 97–3–21, if we had jurisdiction to do so, is irrelevant. *See Moore v. Newell*, 548 F.2d 671, 672 (6 Cir. 1976), *cert. denied*, 431 U.S. 971, 97 S.Ct. 2935, 53 L.Ed.2d 1069 (1977).

Also distinguishable are federal cases relied upon by the magistrate that hold abstention inappropriate unless the challenged state statute is fairly susceptible of a construction that would avoid the federal constitutional question. See Report and Recommendation at 37.

Furthermore, since the federal separation of powers doctrine has not been extended to the States, and since state separation of powers principles are not cognizable in a federal habeas corpus action, *see Mears v. Nevada*, 367 F.Supp. 84, 87 (D.Nev.1973) and cases cited therein, we think the magistrate placed undue emphasis on the word "statute" in the following passage from *Spinkellink v. Wainwright*, 578 F.2d 582, 605 (5 Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979):

> We understand these decisions [*Gregg, Woodson*, et al.] to hold that capital punishment is not unconstitutional per se, and that

Similarly, having construed its death penalty statute to be permissive, the Mississippi Supreme Court, in *Jackson,* had the absolute right to establish procedures to determine the circumstances under which the penalty may be imposed. The Mississippi court has recognized that "its inherent power ... to promulgate procedural rules emanates from the fundamental constitutional concept of the separation of powers and the vesting of judicial powers in the courts." *Newell v. State,* 308 So.2d 71, 76 (1975). The court recently reaffirmed its

authority to fashion judicial rules when it adopted uniform Mississippi rules of civil procedure. Mississippi Rules of Civil Procedure in all Chancery, Circuit and County Courts of the State, No. 1 (adopted by Miss. Sup.Ct. on May 26, 1981). Accordingly, the court's action in establishing the procedure to be used in determining whether the death penalty or a life sentence may be imposed on a person convicted of capital murder does not present an issue cognizable by this federal district court on a petition for writ of habeas corpus.

> a state, if it chooses, can punish murderers and seek to protect its citizenry by imposing the death penalty—so long as it does so through a statute with appropriate standards to guide discretion. If a state has such a properly drawn statute ... which the state follows in determining which convicted defendants receive the death penalty and which receive life imprisonment, then the arbitrariness and capriciousness condemned in *Furman* have been conclusively removed.

In our view, "statute" is not merely the words as written by the legislature but also includes the meaning of those words ascribed by the state court of last resort. *See Winters, supra.* Moreover, any argument that *Gregg* requires death sentence procedures promulgated by democratically elected representatives of the people is met where, as here, state supreme court justices are elected and not appointed.

Finally, we deem misplaced the magistrate's heavy reliance on the lower court opinion in *Baird v. Bellotti,* 450 F.Supp. 997 (D.Mass. 1978), *aff'd.* 443 U.S. 662, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). In *Bellotti,* a three-judge district court was called upon to determine the constitutionality of a Massachusetts abortion statute concerning a minor's right to abortion. The district court first held the statute unconstitutional, but on appeal the Supreme Court remanded with directions that the district court refer the matter to the Supreme Judicial Court of Massachusetts for an authoritative construction of the statute. *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (Bellotti I). *In Bellotti I* the Court rather plainly suggested conditions under which parental consent to a minor's decision to have an abortion would pass constitutional muster under *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), a case decided the same day as *Bellotti I.* 428 U.S. 143–151, 96 S.Ct. 2864, 2868, 49 L.Ed.2d 853–58. Surprisingly, Massachusetts' highest court did not heed the Supreme Court's hint but instead construed the statute in a manner ultimately held unconstitutional in *Bellotti II.* After so construing its own statute, the Massachusetts court stated:

> If the Supreme Court concludes that we have impermissibly assigned a greater role to the parents than we should or that we have otherwise burdened the minor's choice unconstitutionally, we add as a general principle that we would have construed the statute to conform to that interpretation.

*Baird v. Attorney General,* 371 Mass. 741, 360 N.E.2d 288, 292 (1977). Under these circumstances, the district court properly noted that it did not have authority "to fix terms of a state statute contrary to the prima facie interpretation given it by the state court." 450 F.Supp. at 1006. In the case sub judice, we likewise note our lack of jurisdiction to adopt a construction of the death penalty statute contrary to that of the Mississippi Supreme Court. *Bellotti,* therefore, supports our position on nonreviewability rather than adding credence to petitioner's argument.

It should be noted that the Mississippi Supreme Court's construction of the word "shall" in § 97–3–21 as permissive is hardly novel. *See, e. g., Cairo & Fulton RR v. Hecht,* 95 U.S. 168, 170, 24 L.Ed. 423 (1877); *Wilshire Oil Co. v. Costello,* 348 F.2d 241 (9 Cir. 1965); *State v. County School Board,* 181 Miss. 818, 181 So. 313 (1938). Indeed, no better example than the death penalty statute itself can be found to illustrate the subtle differences in connotation that a single word may have.

> Every person who *shall* be convicted of capital murder *shall* be sentenced by the court to death.

The first time it is used, the word "shall" certainly could not mean "must," but rather denotes "might" or "may." Given this, we cannot perceive a justifiable basis on which to conclude that interpretation of the second "shall" as permissive is unreasonable. *See also Beck v. Alabama,* 396 So.2d 645 (Ala.1980) wherein the Alabama Supreme Court construed as permissive Alabama's death penalty statute which provided that, when a defendant is found guilty of capital murder the jury "shall fix the punishment at death."

Neither can Irving complain that the court's *Jackson* construction and procedure constituted an *ex post facto* law under Art. I, § 10, U.S. Constitution, since *Jackson* was decided after Ray's murder was committed. The *ex post facto* argument must fail since the changes brought about by *Jackson* were procedural and ameliorative. See *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

The question before us thus narrows to whether Irving's constitutional rights were violated at the sentencing phase of his trial by the prosecution's use of Irving's school suspension and his prior criminal conviction. Since we find *infra* that Irving must be resentenced and since any resentencing will undoubtedly moot Irving's objections to such matters as were employed at his sentencing as aggravating circumstances evidencing a pattern of incorrigibility, we find it unnecessary to rule upon this contention.

## IV.   Conflict of Interest

### a.   Facts

On March 2, 1976, Irving and Keith Anthony Givhan were separately indicted for the offense of capital murder of Ray.[14] Lewis Myers and Leonard McClellan, Oxford attorneys employed by North Mississippi Rural Legal Services, undertook the defense of both Givhan and Irving shortly after their arrests.[15] Tom Morris joined the defense team in July. Irving was to be tried on November 9, 1976, while Givhan's trial was to commence November 15.

Irving and Givhan, who were confined in the same cell, at first adopted the same approach to their defenses, i. e., to deny any involvement in the crime. In October, however, Irving underwent "spiritual conversion," leading him to decide to testify in his own behalf and tell the truth about his participation in the crime. Givhan continued to take the position that he would deny any involvement whatever. Since they un-

derstood that, apart from a confession by Givhan which counsel hoped to suppress, Irving's testimony was the only evidence that would place Givhan at the scene of the crime, Myers, McClellan and Morris futilely attempted to reconcile the codefendants' divergent positions during numerous discussions.

A week before Irving's trial, defense counsel attempted to initiate plea bargain discussions. Irving desired to plead guilty to a reduced charge of murder, while Givhan, still denying any involvement, was unwilling to plead guilty to any offense. Although Sheriff Hubbard had said that for their pleas to be considered both defendants would have to plead guilty to the same offense, he acknowledged that he did not have authority to speak for the State, as the final decision regarding any plea bargain rested with District Attorney Young. Young explicitly rejected a proposal that Irving plead guilty to murder and receive a life sentence. There was no discussion of a plea bargain on behalf of Givhan until after Irving was tried, convicted of murder, and sentenced to death. As expressed by County Attorney Roberts at the habeas hearing:

> The State felt that there was nothing to discuss. Irving was indicted for capital murder and that's what the State wished to pursue, what we intended to pursue, and what we did pursue.... [M]y attitude throughout the thing from its inception was that there was nothing that could be discussed on Mr. Irving because we were intent on pursuing the capital murder charge.
>
> Now, as to the defendant Anthony Givhan, my recollection is about the same.... The State was principally interested in trying Mr. Irving first. And prior to the trials of both of them the State was seeking the same penalty. Let me speak for myself. That was my feeling that we were seeking the same penal-

---

**14.** Because the original indictments failed to affirmatively recite the statute alleged to have been violated, they were *nolle prossed* and new indictments returned on July 6, 1976.

**15.** Myers and McClellan were contacted by Givhan's and Irving's families and agreed to represent the codefendants free of charge.

ty. We were just simply never in a position to discuss plea negotiations on either defendant prior to Mr. Irving's trial.

Habeas Trans. at 156–57.

We therefore find as a fact that prior to Irving's trial there was never a firm offer to accept a plea from Irving or Givhan.

After their plea efforts proved fruitless and it became apparent that there would be no change in the attitude of either defendant as to their respective defenses, defense attorneys decided to seek withdrawal as Irving's counsel because of the conflict of interest between the two defendants. Irving agreed to this course of action.

Thus, on November 8, 1976, the day before trial, Myers filed a motion to withdraw. In his supporting affidavit, Myers stated:

. . . .

2. After having consulted with my clients on numerous occasions regarding the facts involving this case, it is my opinion that my continued representation of both of these defendants would involve a serious and manifest conflict of interest. I believe that my representation of both defendants jointly is prescribed [sic] by the United States Supreme Court's decision in *Glasser v. United States*, 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680].

3. I am prepared to outline to the Circuit Court of Pontotoc County, Mississippi, each area of conflict of interest that is involved in both of these cases.

4. I feel that it would be unethical and unprofessional to continue my representation in the above case.

5. The attached motion for withdrawal of counsel is not filed as a dilatory or delaying tactic on the part of the defense. It is filed solely because justice mandates that a withdrawal in this matter be granted.

6. The attached motion was filed primarily because of certain incidents, discussions and conversations that have transpired between the defendants and myself in the past five (5) days.

7. It has become almost impossible for me as trial counsel to successfully represent the interests of both defendants in view of certain conflicts of interest.

Tr. Trans. at 31–32.

Myers related the perceived areas of conflict at a chambers hearing before the trial judge, in which he stated *inter alia* :

I attempted to discuss this case with both individuals, particularly with Mr. Irving since his case was docketed for the first trial. It became difficult for me as counsel in attempting to construct a defense, in attempting to give advice to my client because of certain notions, because of certain ideas that he had allegedly based on this conversion.

At that time, again, the conflict arose inasmuch as the two defendants had different views. And I was also informed at that time that certain statements that were made following their arrest implicated both defendants. I'm particularly referring to the fact that both defendants allegedly gave statements that implicated each other. At the time that I learned this I probed and searched to find out whether or not this would create a conflict of interests. Both defendants at that time articulated somewhat different postures or positions about how they previewed their defense which conflicted with each other.

As trial counsel I was then faced with a situation in terms of representing both defendants as to whether or not to put one defendant on who has stated that he wants to testify in his own behalf, but his testimony conceivably could conflict with the defense of his codefendant. The other codefendant took somewhat of a different position as to how he perceived the trial of this matter, which caused some confusion as to how I should proceed in terms of putting on my case.

Tr. Trans. at 51–52.

Because "one individual felt that his situation was contradistinguishable from the other," Myers felt that he "could not ethically, professionally and based on [his] reading of Glasser, advise either defendant at that point as to what posture they should

assume" since he might be "compromising the interests of one ... codefendant[ ] at his expense in favor of another codefendant who conceivably ha[d] a different trial posture." Myers alleged that he was not aware of the "adamancy of the views of one defendant" until after the special venire panel had been drawn. At that time, "[t]his particular defendant took the position that based on certain notions that he had, that he would not do certain things that I thought were in his best interests as his trial counsel."

Myers later made clear that "this particular defendant" referred to was Irving.

> Now, my particular problem has been that I talked to Mr. Irving, who is present here before the Court now, and I have had some discussions with him this morning about it, has his own notions, based on being born again, about how he perceives this trial.
>
> Now, as counsel for Mr. Irving and having received my law degree and having somewhat degree of expertise and experience in the area, however it might be, I think that some of his ideas are contrary to my better judgment and certainly would pose a conflict, a potential conflict in terms of my representation or in terms of what I would advise.

Tr. Trans. at 54–55.

Myers concluded that he "would be willing to stay and pursue the matter that is currently pending against ... Givhan."

The trial court concluded that, since defendants' trials had been severed, "[t]here can be no prejudice ... to either defendant by counsel representing these defendants." Furthermore,

> the Court reminded defense counsel that the absolute deadline for filing of motions was the first day of the Term of Court, which has now passed by some eight days. And now after counsel has requested a special venire and the special venire is drawn, he asks to be discharged and allowed to withdraw as counsel.

Tr. Trans. at 58.

Forced to represent both Irving and Givhan, the defense attorneys decided that "under the circumstances the best defense that could be presented was in fact no defense." Habeas trans. at 101A. Thus, no defense witnesses were called at the guilt stage of Irving's trial. The jury brought in a verdict of capital murder, and the sentencing phase of trial commenced. Irving, thinking his telling the truth would save his life, wished to testify, but his attorneys would not allow him to do so because they knew his testimony would implicate Givhan and were apprehensive that such testimony could and would be used against Givhan at his later trial. The defense attorneys made this decision even though they were of the opinion that Irving's own testimony would most likely have beneficent effects for him. Specifically, they thought that by testifying Irving had a substantial chance to persuade the jury to spare his life and impose life imprisonment because Irving would have expressed his spiritual conversion and remorse for the deed. We find as a fact that defense counsel would have permitted Irving to testify at his sentencing but for their concern for the other client, Givhan. Indeed, this fact is not challenged by respondents, who only maintain the effect of such fact is of no legal significance.

Irving's conflict of interest claim was raised on direct appeal. The Mississippi Supreme Court held that since neither Irving nor Givhan testified in Irving's trial, and since "[c]ounsel relied wholly upon the weakness of the State's case and upon evidence other than their testimony," and since "[t]he record does not indicate that Attorney Myers would have defended any differently or would have approached the defense of the case on another basis had he not been representing Givhan," there was no showing of "prejudice or harm resulting to appellant on account of the alleged conflict of interest." It therefore denied relief on the conflict of interest claim. *Irving v. State*, 361 So.2d 1360, 1365 (1978).

The magistrate, agreeing with the foregoing conclusion of the state supreme

court,[16] found there was no actual conflict of interest.

### b. The Law

In *Glasser v. U. S.*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Court held that the " 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." *Id.* at 70, 62 S.Ct. at 465, 86 L.Ed. at 699. A determination of the degree of prejudice suffered by one whose counsel was operating under a conflict of interest was deemed "at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Id.* at 76, 62 S.Ct. at 467, 86 L.Ed. at 702. As the Court noted in *Holloway v. State of Arizona*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), a prejudice requirement

> would not be susceptible of intelligent, even-handed application. In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.
>
> It ... would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interest on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error ... would require ... unguided speculation.[17]

*Id.* at 490–91, 98 S.Ct. at 1182, 55 L.Ed.2d at 438 (emphasis original).

The mere fact of joint representation, however, does not per se give rise to a violation of the constitutional right to effective assistance of counsel. *Id.* at 482, 98 S.Ct. at 1177, 55 L.Ed.2d at 433. Nor is a potential for conflict sufficient to reverse a conviction. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333, 348. Rather, "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.; see United States v. Martinez*, 630 F.2d 361, 362 (5 Cir. 1980), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). The concept of "actual conflict" is, however, incapable of easy detection.

An actual conflict of interest, as distinguished from a hypothetical or speculative conflict, arises "when the defense attorney places himself in a situation inherently conducive to divided loyalties." *United States v. Kranzthor*, 614 F.2d 981, 983 (5 Cir. 1980); see *United States v. Medel*, 592 F.2d 1305, 1310 (5 Cir. 1979) (actual conflict is "some divergence in the parties' interests"). As the Fifth Circuit has noted:

> [T]he Sixth Amendment right to counsel implies much more than a minimum level of competence; even otherwise competent trial lawyers may sometimes find themselves in a position in which they are unable to render effective assistance of counsel. Thus, where defense counsel in a criminal trial represents one of several clients with conflicting interests, his effectiveness as a vigorous advocate for a

---

16. The state court's finding of no conflict of interest is, of course, a mixed finding of fact and law and is therefore not entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Cuyler v. Sullivan*, 446 U.S. 335, 341, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333, 342 (1980).

17. A distinction may no longer be drawn between appointed and retained counsel in the conduct of a criminal prosecution. *Cuyler v. Sullivan*, 446 U.S. 335, 344–45, 100 S.Ct. 1708, 1716–1717, 64 L.Ed.2d 333, 345 (1980); *United States v. Alvarez*, 580 F.2d 1251, 1256 (5 Cir. 1978).

particular defendant may be impaired by his commitment to other clients.... Undivided loyalty and fidelity of commitment is therefore the guiding principle in this important area of Sixth Amendment jurisprudence.

*Alvarez, supra,* at 1254.

More helpful definitions of "actual conflict" may be found. For example, the Fifth Circuit has stated:

If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

*Zuck v. State of Alabama,* 588 F.2d 436, 439 (5 Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). In *Foxworth v. Wainwright,* 516 F.2d 1072, 1076 (5 Cir. 1972), the court held that "[a] conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing" and that "[a]n alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Id.* at 1080.

■ After reviewing controlling precedents, we agree with the Ninth Circuit that the appropriate inquiries are: "Did the representation deprive ... defendant[ ] of the undivided loyalty of counsel? Did counsel have to, or did he in fact, 'slight the defense of one defendant for that of another'?" *Sanchez v. Nelson,* 446 F.2d 849, 851 (9 Cir. 1971) (quoting *Peek v. United States,* 321 F.2d 934, 944 (9 Cir. 1963), *cert. denied,* 376 U.S. 954, 84 S.Ct. 973, 11 L.Ed.2d 973 (1964). We are also mindful that "when the defendant has been convicted of a capital offense, courts must strictly scrutinize counsel's conduct." *Voyles v. Watkins,* 489 F.Supp. 901, 910 (N.D.Miss.1980); see *Irving v. State,* 441 U.S. 913, 915, 99 S.Ct. 2014, 2015, 60 L.Ed.2d 386, 387 (1979) (Justices Marshall

and Brennan dissenting from denial of certiorari).

McClellan maintained at the habeas hearing that, if defense counsel had not also been required to consider Givhan's interests, they would have:

1. devoted more time to preparation of petitioner's defense since they would not have been under the pressure of also preparing for Givhan's trial the following week;

2. advised petitioner to enter a plea of guilty to a reduced charge if such an option were available; and

3. allowed petitioner to testify.

The first two grounds may be disposed of easily.

■ Although Irving's counsel may have had more time to prepare for petitioner's defense, we deem this ground speculative. Indeed, if such a claim were allowed to constitute an actual conflict of interest, then attorneys would not be allowed to represent more than one client at any time.

■ As for plea negotiations, we have concurred in the magistrate's finding that no firm offer to accept a plea to a lesser offense was ever made by the State prior to Irving's trial. Any statements attributable to Sheriff Hubbard were not binding on the State and defense counsel had no reasonable basis on which to form a belief that they would have been more likely to have Irving's plea accepted if Irving had been represented by independent counsel. This ground of alleged conflict is also speculative.

■ The third ground, however, raises serious questions as to counsel's "undivided loyalty" to Irving. Since both McClellan and Irving stated at the habeas hearing that Irving's testimony would have related only to sentencing and not to guilt, we find that counsel's advice that Irving not testify at the first phase of trial was based on tactical reasons and not on the fact that counsel also represented Givhan. Irving's proferred testimony regarding his spiritual conversion and remorse would not, of course, constitute a defense at his trial. See *Foxworth, supra.* We therefore con-

clude that there was no actual conflict of interest at the guilt/innocence stage of trial because of Irving's desire to testify on his own behalf.

■ There can be no doubt, however, that Irving's testimony would have presented relevant circumstances to mitigate against imposition of the death penalty. Indeed, a defendant's admission of guilt, expression of remorse for the crime, and the sincerity with which such expressions are made by the accused are clearly material to informed sentencing. This is intensified when, as here, the accused is no more than twenty years old and has no record of criminal convictions other than pleading guilty, at age eighteen, to charges of burglary and larceny. Furthermore, we find that Irving would have in fact testified at sentencing had he been represented by separate counsel. Indeed, it is undisputed that counsel would have advised Irving to testify at this stage of the trial except for the fact that they thought that his testimony, which would have placed Givhan at the scene of the crime, could have been used at Givhan's trial.

The magistrate, however, concluded that under *Cuyler*, there must have been a substantial likelihood that Irving's testimony could have been so used by the State. Initially, we disagree that such is required. As heretofore noted, the relevant inquiry is "Did counsel have to, *or did he in fact*, 'slight the defense of one defendant for that of another'?" *Sanchez, supra* (emphasis added). In their zeal to protect Givhan, the defense attorneys sacrificed Irving's fundamental right to testify in his own behalf. As the Fifth Circuit has noted, "the mere existence of a temptation in the abstract is sufficient to preclude duality of representation." *Zuck, supra*, at 440.

Therefore, even if in fact Irving's testimony could not have been used *against* Givhan, counsel's belief that it could be so used denied Irving effective assistance of counsel.[18]

■ However, even if it must be shown that there was a substantial possibility that Irving's testimony could have been used against Givhan, we find such a possibility existed. It is true that under Mississippi law the State could not have introduced petitioner's trial testimony against Givhan at Givhan's later trial. *State v. Thornhill*, 251 Miss. 718, 171 So.2d 308, 312 (1965); *Pickett v. State*, 164 Miss. 142, 144 So. 552 (1932); *Pickens v. State*, 129 Miss. 191, 91 So. 906 (1922). This ignores the fact, however, that Irving could have been called by the State to testify against Givhan. If his testimony at Givhan's trial contradicted Irving's testimony at his own trial, the State could have then used petitioner's prior testimony to impeach him. Counsel's fears in this regard were therefore reasonable and not merely speculative. We therefore find that counsel had an actual conflict of interest which was detrimental to Irving.

We sympathize with the state trial judge who, being faced with a motion to withdraw after empaneling a special venire of jurors, understandably felt counsel was employing a tactic to delay trial. Counsel's dilatoriness in informing the trial court of the conflict which existed between Irving and Givhan evidences a gross disregard for the administration of justice as well as the interests of his clients. Myers' affidavit in support of his motion to withdraw indicates that he was or should have been aware of this conflict long before he called it to the court's attention, if not from the time he and McClellan were first approached to represent both Irving and Givhan. We have

---

18. In his report and recommendation, the magistrate concludes that since Irving has not contended that "his counsel were ineffective because they misunderstood the law and therefore refused to permit him to testify out of a mistaken belief that by testifying in his own defense petitioner would provide evidence which the State would use against their other client," any such claim is precluded from review by this court because of failure to exhaust state remedies. Since a constitutional violation may not be premised on conflict of interest unless such a conflict "adversely affected his lawyer's performance." *Cuyler, supra*, at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 348, any claim of conflict of interest inherently involves a claim of ineffective assistance of counsel. Furthermore, the reason for Irving's failure to make such a claim is obvious: he is represented here by the same counsel as represented him at trial.

no doubt that the able trial court would have appointed separate counsel for Irving had he been apprised of the facts a reasonable period of time prior to trial. Additionally, though the fact of conflict was brought to the attention of the trial judge, the exact nature of counsel's dilemma was incredibly masked in a garb of rhetoric. We, too, are exasperated by the prospect of allowing counsel to use their ineptitude in our court as a basis for relief.[19] Nonetheless, the proper sanction for defense counsel's delay would have been to impose upon Myers and McClellan the costs of impaneling the general and special venire, as well as other costs incurred by the State in getting ready for trial on November 9; counsel's misfeasance should not have been used to require Irving to proceed to trial with ineffective assistance of counsel.

### V. Remedy

The magistrate recommended that the writ of habeas corpus issue for Irving's discharge from custody unless the State elects to retry him for capital murder in accordance with constitutionally acceptable standards. However, since we have found Irving's underlying conviction of capital murder to be valid, and since, other than death, the only sentence available to Irving under Mississippi law would be life imprisonment, it is proper to vacate Irving's death sentence, thereby resulting in the imposition of a life sentence unless the State chooses to resentence Irving in accordance

with existing state law within 120 days after this date.

### VI. Summary

Referring to pages 2 and 3, *supra*, we deny as meritless all grounds contended by Irving as a basis for habeas relief except for ground 4, which we grant only as it relates to sentencing, and ground 7, upon which we find it unnecessary to rule.[20]

An Order will issue accordingly.

---

**19.** We are appalled with their blatant disregard, if not inexcusable ignorance, of ethical standards which prohibit an attorney with trial responsibility from testifying as a material witness on a crucial issue as McClellan did at the habeas hearing. DR 5–101(B) & 5–102, Code of Professional Responsibility. We therefore censure McClellan and his colleagues for not withdrawing as Irving's counsel upon the filing of the habeas petition and requesting the court to appoint independent counsel, since they knew from the inception that McClellan or Myers, or both, expected to testify at the habeas hearing. When the magistrate raised the propriety of McClellan giving testimony (Habeas Trans. 8–12), his tactic of bringing in another attorney from the same legal services organization to conduct the examination of McClellan surely did not satisfy professional standards required of the bar. At this juncture, we can do no more than issue this reprimand and order

that if such application is made, no compensation under the Criminal Justice Act be allowed McClellan and Myers for representing Irving in federal court. Furthermore, since, having represented Givhan, such counsel would still be operating under a conflict of interest if they were permitted to represent Irving on any resentencing, we strongly urge the state court, on resentencing, to appoint as Irving's counsel an attorney who had no involvement in Irving's prior trial in any way.

**20.** We deem it unnecessary to discuss grounds 8 and 9, which we find to be wholly lacking in merit. Ground 6, alleging that the death penalty is administered in Mississippi in a discriminatory manner, was considered and rejected by this court in *Washington v. Watkins* (unreported), No. GC 79–93–K–P (Dec. 19, 1979).